RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
ALLIE WILSON
Assistant Federal Public Defender
New York State Bar No. 5479597
200 S. Virginia Street, Suite 340
Reno, Nevada 89501
(775) 321-8451/Tel.
(702) 388-6261/Fax
allie_wilson@fd.org

Attorney for Nathan Michael Keays

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 3:20-cr-00085-GMS-MMS-2 |
| vs. | |
| NATHAN MICHAEL KEAYS, | |
| Defendant. | |

### Motion to Dismiss[1]

Nathan Keays, by and through undersigned counsel, hereby files a motion to dismiss the indictment in this matter with prejudice for prosecutorial misconduct. This motion further raises additional grounds for a new trial, also based on prosecutorial misconduct. This motion is filed out of time because it is based on information received by the defense on June 13 and 20, 2025.[2]

---

[1]    Mr. Keays requests an evidentiary hearing to the extent the Court finds that the facts contained herein are insufficient to establish that dismissal is an appropriate remedy.

[2]    The parties agreed to a briefing schedule that required the defense to submit any supplemental motions by May 30, 2025. ECF No. 381. Mr. Keays filed a supplemental motion for

## I. Introduction

Mr. Keays previously filed a supplemental motion for a new trial that addressed newly discovered facts that the trial judge presiding over Mr. Keays' trial, former Judge Kindred, had engaged in numerous acts of judicial misconduct. ECF No. 385. That misconduct included sexual contact or otherwise sexually inappropriate behaviors with a former law clerk and two attorneys who regularly appeared before him. *Id.* at 10-12. It also included Kindred lying under oath to the judicial body investigating his conduct while presiding over Mr. Keays' case. *Id.* The supplemental motion argued that Kindred engaged in judicial misconduct by failing to recuse himself from Mr. Keays' case in light of a conflict of interest between himself and the U.S. Attorney's Office at large and, specifically, two U.S. Attorneys involved in Mr. Keays' prosecution—Karen Vandergaw and James Klugman.[3] *Id.* at 19-22.

Although the supplemental motion highlighted Klugman's and Vandergaw's dishonesty, the motion refrained from specifically arguing that prosecutorial misconduct warranted dismissal or provided additional grounds for a new trial. Claims of prosecutorial misconduct supporting dismissal are serious, and it was not clear at the time of the supplemental motion's filing that there was a sufficient basis.

_____

a new trial by that date. New information disclosed on June 13 and 20, 2025 necessitated counsel supplementing further with a Motion to Dismiss. On June 20, 2025, the government disclosed that, on June 6, 2025, ███████████████████████████████████████████ ██████████. On June 13, 2025, the government disclosed email correspondence dated January 15, 2025, from ██████████████████████████. Although the former was disclosed two weeks after the findings were made, the latter was within the possession of ████████████ ██████████ yet was not disclosed until after the motion deadline. On July 21, 2025, the Court granted leave to file this motion to dismiss out of time.

[3] Both Vandergaw and Klugman are on administrative leave from the U.S. Attorney's Office.

2

Given the most recent disclosures, there is now a sufficient basis to dismiss based on Vandergaw's and Klugman's actions for two reasons. First, in June 2025, 

. *See* ECF No. 415-1.[4] Klugman has been placed on administrative leave while his employer continues to pursue its internal processes in response to those findings.

Second, recently disclosed information reveals that Klugman provided dishonest statements in connection with this litigation. Klugman has maintained that he "know[s] of no information suggesting that then Judge Kindred was aware before or during the *Keays* trial of [his] romantic involvement with AUSA Vandergaw." ECF No. 412-3 (Declaration by A. James Klugman). Klugman swore to that statement under penalty of perjury. *Id.*

But new information shows that Klugman knew—or at least certainly should have known—that Kindred was aware of Klugman's relationship with Vandergaw prior to Keays' trial. Kindred would have been aware because that relationship was the subject of extensive talk throughout the federal courthouse both inside and outside the U.S. Attorney's Office. *See* ECF No. 415-2.[5] Indeed, at least one judge became aware of the relationship between Vandergaw and

---

[4]     ECF No. 415-1 is a letter that was provided to the defense on June 20, 2025. ███ ████████████████████████████████████████. The letter was filed under seal as Exhibit A to Mr. Keays' Reply in Support of Motion for a New Trial, which was filed on July 14, 2025, as ECF No. 415. References to that letter in this motion will cross-reference to that filing.

[5]     ECF No. 415-2 is an email that was provided to the defense on June 13, 2025. It was authored, however, on January 15, 2025. The letter was filed under seal as Exhibit B to Mr. Keays' Reply in Support of Motion for a New Trial, which was filed on July 14, 2025, as ECF No. 415. References to that email in this motion will cross-reference to that filing.

Klugman based on observations of them together in the courthouse. *See id.* The clear inference that follows is that Klugman (via his intimate relationship with Vandergaw) had information that could doom Kindred's career—i.e. information confirming Kindred's sexually inappropriate relationship with Vandergaw—and that Kindred knew it, thus creating the distinct possibility of bias.

This Court may—and should—exercise its supervisory power to dismiss this indictment with prejudice in light of continued misconduct by one of two prosecutors who tried this case. *See United States v. Bundy*, 968 F.3d 1019, 1030 (9th Cir. 2020) (authorizing courts to dismiss indictments to remedy constitutional violations, preserve judicial integrity, and deter future illegal conduct). Dismissal is an "appropriate means of policing ethical misconduct by prosecutors." *United States v. Lopez*, 4 F.3d 1455, 1463 (9th Cir. 1993) (citing *United States v. McClintock*, 748 F.2d 1278, 1285-86 (9th Cir. 1984)).

Dismissal is warranted here. The ████████████████████ and the revelation that he misled the defense in connection with this post-trial investigation pushes this matter into the realm of not just judicial misconduct, but also prosecutorial misconduct. Klugman and Vandergaw—like Kindred—have proven themselves to be inclined to lie to protect their reputations and careers. And it is now clear that one of the trial attorneys in this case has misled the defense in this litigation. Meanwhile, the credibility of two others involved in the case—Judge Kindred and Vandergaw—has been thoroughly impugned. In the alternative, Klugman's misconduct provides additional grounds for a new trial beyond what was raised in Mr. Keays' supplemental motion for a new trial. ECF No. 385.

At the very least, an evidentiary hearing is warranted to investigate the extent of the dishonesty here and its effects on Mr. Keays' prosecution and this inquiry.

## II.     Background

Mr. Keays incorporates herein the facts in his supplemental motion for a new trial, ECF No. 385. The additional background in this motion raises facts relevant to prosecutorial misconduct, which includes facts unknown to the defense at the time of the filing of Mr. Keays' new trial motion.

**A.**     ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████ *See* ECF No. 412-1. And second, Klugman's now-wife, Vandergaw, who also played a part in prosecuting Mr. Keays' case, albeit a less substantial role as a "filter" or "taint" attorney.[6] *See* ECF No. 385 at 16.

The DOJ found that Vandergaw "committed intentional professional misconduct" prior to Mr. Keays' supplemental motion. *See* ECF No. 385 at 16-17. The DOJ made this finding on five grounds: (1) she conceal her sexual interactions with Judge Kindred; (2) she continued to represent the United States despite the conflict of interest that arose out of her interactions with Judge Kindred; (3) she intentionally misrepresented the unprofessional nature of her interactions with Judge Kindred to investigators; (4) she failed to report Judge Kindred's misconduct; and (5) she knowingly assisted Judge Kindred in violating the Judicial Code of Conduct. *See* Office of Professional Responsibility, 2025 Investigative Summary 3 (March 19, 2025), https://www.justice.gov/opr/2025-investigative-summary-3.

---

[6]     A "filter" attorney reviews discovery to ensure that privileged materials are not produced to the trial team.

[REDACTED]. Mr. Keays' supplemental motion already raised suspicions as to Klugman's honesty. ECF No. 385 at 13-14. It was apparent from statements by Klugman's superiors that he had repeatedly misrepresented the nature of his relationship with Vandergaw and that he generally had a reputation for dishonesty. *Id.* [REDACTED]

[REDACTED] ECF No. 415-1. [REDACTED]

[REDACTED]

[REDACTED] *Id.*

**B. The romantic relationship between Vandergaw and Klugman was common knowledge throughout the courthouse.**

Despite evidence to the contrary, *see* ECF No. 412 at 17-22, Klugman and Vandergaw claim that their romantic relationship began in January 2024—months prior to Mr. Keays' trial. They claim that they had no romantic relationship even as they took numerous work-related trips together throughout 2023 (including sharing a hotel room in Seattle when Klugman traveled for work and Vandergaw joined without notifying their shared employer), even as Vandergaw moved in with Klugman in December 2023, and even as they planned a trip together to Hawaii, where they intended to share a studio hotel room for a vacation that Klugman described as a "honeymoon." *Id.*

Regardless of Klugman's and Vandergaw's claim that their romantic relationship began in January 2024, many throughout their office and the courthouse at large believed that the two were engaging in an affair many months earlier. A colleague at the U.S. Attorney's Office wrote,

6

"[t]hroughout this time (the summer of 2023) [Klugman's] and [Vandergaw's] physical affection for each other was obvious to members of the office and the court community and as a result much commented upon." ECF No. 415-2 at 3. Indeed, their inappropriate relationship was so well known that if coworkers needed to speak to Klugman but found Klugman's office door closed, they would assume that Vandergaw was inside and would not just knock before entering but would knock "and wait an appreciable moment before entering" out of fear of walking in on the two engaging in physical intimacy in the office. *Id.* And their inappropriate relationship was so well known that at least one judge commented on the relationship to that same coworker at the U.S. Attorney's Office, purportedly passing along a rumor that a U.S. Marshal had "seen them be physically intimate in the courthouse." *Id.* at 4.

### C. Klugman and his superiors all knew about the relationship between Klugman and Vandergaw and about the allegations involving Vandergaw and Kindred.

The top echelons of the U.S. Attorney's Office—who bear ultimate responsibility for staffing decisions—were aware of both the obvious affair between Klugman and Vandergaw and of the allegation of sexual misconduct involving Vandergaw and Kindred. U.S. Attorney Lane Tucker knew. *See* ECF No. 387-4 at 17, 111-14; ECF 412-2 at 1-2, 6-7. First Assistant U.S. Attorney Kate Vogel knew. *See* ECF No. 387-3 at 70-71, 143-50; ECF No. 412-1 at 6, 11-13.

Klugman also knew about the allegations involving Vandergaw and Kindred. First Assistant U.S. Attorney Kate Vogel stated she informed Klugman that Vandergaw was barred from appearing in front of Kindred because of allegations that Kindred and Vandergaw exchanged nude photographs. *See* ECF No. 412-1 at 17; ECF No. 387-5 at 28. While Klugman calls that information "hearsay" and claims he never discussed it directly with Vandergaw until after the July 2024 release of the Judicial Council's report, he admitted in the course of this post-trial

investigation that he was aware long before Mr. Keays' trial of the allegations involving his girlfriend and Judge Kindred. ECF No. 387-5 at 28; ECF No. 412-3 at 2.

Yet, Klugman was not removed from this case as an attorney of record until October 25, 2024. *See* ECF No. 343.

### D. Klugman and Vandergaw provided false or misleading statements in connection with this investigation.

Both Vandergaw and Klugman would have been aware that Kindred likely knew about their romantic relationship. It would have been impossible for Kindred not to know, given Klugman's and Vandergaw's lack of discretion and the rampant gossip about them throughout the courthouse. *See* ECF No. 415-2; *see also supra* Section II.B.

Yet, both Vandergaw and Klugman claim that they have no reason to believe Judge Kindred knew that they were romantically involved and cohabitating at the time of Keays' trial. Klugman states, under penalty of perjury: "I know of no information that then Judge Kindred was aware before or during the *Keays* trial of my romantic involvement with AUSA Vandergaw." ECF No. 412-3 at 4. Vandergaw identically states, also under penalty of perjury: "I know of no information that then Judge Kindred was aware before or during the *Keays* trial of my romantic involvement with AUSA Klugman." ECF No. 412-4.

Both statements are demonstrably false. By the account of another Assistant U.S. Attorney, their "physical affection for each other was obvious to members of the office and the court community and as a result much commented upon." ECF No. 415-2 at 3.

### E. Kindred, Klugman, and Vandergaw used encrypted messaging applications that delete records of communications.

There is no record of Vandergaw's communications with Kindred. She intentionally used the encrypted messaging application "Signal" to communicate with Kindred once the sexual

8

misconduct began. *See* ECF No. 387-6 at 184; 387-9 at 122. Signal is encrypted—i.e. the only way to view a message is by accessing the device that either sent or received the message. It also allows users to delete messages from both the sender's and the recipient's accounts. Vandergaw used Signal because she could delete messages from both her own phone and Kindred's phone. *See* ECF No. 387-9 at 122. And Vandergaw set even her ordinary messaging application to delete messages after thirty days. *Id.* Therefore, there likely is no record of any of her text conversations. *See* ECF No. 387-6 at 184.

Vandergaw and Klugman also used Signal to communicate with each other. ECF No. 387-9 at 258-59. Thus, Vandergaw's communications with both individuals are not available to the defense. The only evidence of their communications that exists is their own testimony.

### F. The primary FBI agent in the original investigation into Mr. Keays was fired for reasons unknown to the defense.

Former FBI Agent Tyler Vose was the original investigating agent in this matter. His name is littered throughout early disclosures in this case. He signed affidavits in support of warrants. He interviewed witnesses. He was the primary point of contact for ConocoPhillips.

Vose also conducted interviews with both Mr. Keays and Mr. Wright in which both defendants sought to cooperate with the government. He interviewed Mr. Keays on multiple occasions during the early months of the investigation, including in a formal proffer in the presence of Mr. Keays' trial counsel. He also conducted the first proffer and subsequent interviews with co-defendant and government cooperator Mr. Wright. Mr. Keays was never contacted again in furtherance of his potential cooperation. Instead, the government pursued cooperation with Mr. Wright, even though the government acknowledges that Mr. Wright—not Mr. Keays—was the orchestrator of this fraud and the more culpable party. *See* ECF No. 385 at 5-6; ECF No. 219 at 2-4.

9

Vose was dismissed from his position at some point prior to Keays' trial. Upon information and belief, the government informed Mr. Keays' trial counsel only of the basic detail that the former agent was dismissed but provided no details on the underlying misconduct. Undersigned counsel received no information about Vose from the government. To the extent Vose is referenced in the government's disclosures to the undersigned counsel, he is identified simply as a "law enforcement official involved in the *Wright & Keays* case." ECF No. 412-4 at 5. Counsel instead connected the dots through a news article written by Vose.[7] In that article, Vose alleges that the FBI submitted what he believes was a "provably false document in camera to the then-U.S. District Court Judge Joshua Kindred in *U.S. v. Keays*."[8] In that article, Vose provides no further information or basis for his allegation. Undersigned counsel has received no information that would support this allegation.

Vose's dismissal created potential disclosure obligations pursuant to *Henthorne* and *Giglio* for several federal cases, including Keays' case. Vandergaw participated in a meeting to discuss the government's disclosure obligations in pending cases along with Klugman, AUSA Heyman, and AUSA Alexander. *See* ECF No. 412-4 at 4-5; ECF No. 412-5 at 3. According to those individuals, she participated only as to the government's obligations in other cases and did not participate in any decision making related to the government's disclosure obligation to Mr. Keays. *Id.*

---

[7]     *See* Tyler Vose, *Former FBI agent details retaliation from Anchorage office*, THE ALASKA LANDMINE (Dec. 1, 2024), https://alaskalandmine.com/landmines/former-fbi-agent-details-retaliation-from-anchorage-office/.

[8]     *Id.*

Vose's conduct may also have created *Brady* obligations given his extensive involvement in Mr. Keays' case and in decision making throughout the investigation into Keays. Upon information and belief, the defense did not receive any *Brady* disclosures as to Vose.[9]

## III.    Argument

### A.  The newly disclosed evidence supports a more drastic remedy than a new trial.

A Court may fashion a remedy pursuant to its inherent supervisory powers for any one of three reasons: "'(1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct.'" *Bundy*, 968 F.3d at 1030 (quoting *United States v. Struckman*, 611 F.3d 560, 574 (9th Cir. 2010); *see also United States v. Doe*, 125 F.3d 1249, 1253 (9th Cir. 1997). In exercising supervisory powers, courts can choose among remedies, with dismissal with prejudice as the most drastic of the available remedies. *See, e.g.*, *Bundy*, 968 F.3d at 1031. Dismissal with prejudice is appropriate only when there is "flagrant misbehavior," "substantial prejudice," and no lesser remedy available. *Id. See also United States v. Chapman*, 524 1073, 1085-87 (9th Cir. 2008).

The Ninth Circuit has found that "exercise of supervisory powers is an appropriate means of policing ethical misconduct by prosecutors." *Lopez*, 4 F.3d at 1463 (citing *United States v. McClintock*, 748 F.2d 1278, 1285-86 (9th Cir. 1984)). The Ninth Circuit has further found that trial courts have the authority "to dismiss actions where government attorneys have 'willfully

---

[9]     Undersigned counsel was not trial counsel and is not privy to communications that occurred prior to the change of counsel. This statement is based on email correspondence with Mr. Keays' prior counsel.

deceived the court,' thereby interfering with 'the orderly administration of justice.'" *Id.* (quoting *United States v. National Medical Enters., Inc.*, 792 F.2d 906, 912 (9th Cir. 1986)). Dismissal under these circumstances serves to "deter future illegal conduct" by prosecuting attorneys. *Bundy*, 968 F.3d at 1030.

### i. Klugman engaged in "flagrant misbehavior" in connection with this litigation.

The level of misconduct amongst government attorneys involved in this case is astounding, as is their efforts to conceal their wrongdoings, including with respect to this post-trial investigation. Two government attorneys have provided statements in connection with this investigation and post-trial litigation that are demonstrably false but that serve to both protect themselves from further professional ruin and to obstruct Mr. Keays from showing this Court the extent of the misconduct here.

Even given the profound difficulties in proving prosecutorial misconduct when faced with prosecutors whose credibility the government acknowledges is impugned, *see* ECF No. 412 at 36, the defense can prove the following facts that meet the threshold for prosecutorial misconduct:

1. Vandergaw and Klugman were in a romantic relationship that was obvious to everybody in the courthouse, at least by the time of Mr. Keays' trial, if not far earlier.

2. Kindred must have known about that romantic relationship because it was obvious to everybody in the courthouse and because Kindred also had a personal relationship with Vandergaw.

3. In the course of this investigation, both Vandergaw and Klugman knowingly provided false information that Kindred would not have known about their romantic relationship, despite their lack of discretion in engaging in physical intimacy in the courthouse.

12

4. Klugman knew that there was an allegation regarding nude photos shared between Vandergaw and Kindred, even if he disingenuously claims he did not discuss the allegations with Vandergaw until after July 2024.

5. Managers in the U.S. Attorney's Office knew about Vandergaw's intimate relationships with both Kindred and Klugman.

6. Vandergaw communicated with both Klugman and Kindred via an encrypted messaging application that allows for the deletion of messages from both sender and recipient. Vandergaw also set her ordinary text application to delete messages. There is no record of Vandergaw's inappropriate communications with Kindred. There is a reasonable assumption, therefore, that physical evidence that would support Mr. Keays' claim may have been destroyed.

7. Nobody from the U.S. Attorney's Office disclosed to the defense that the girlfriend (Vandergaw) of the trial attorney (Klugman) was embroiled in an investigation into a scandal that could—and did—end Kindred's judicial career.

8.  and are on administrative leave pending further review.

With these facts alone, the possibility for bias here should have been obvious to all involved, including Klugman and his superiors at the U.S. Attorney's Office. Even assuming against all reason that Klugman can be taken at his word that Vandergaw did not discuss her relationship with Kindred, Klugman was nonetheless aware of the misconduct allegation involving Vandergaw and Kindred. And the reasonable assumption from any observer of their obvious

workplace affair (including Kindred) would be that Klugman was aware of Vandergaw's side of that story from Vandergaw directly.

Thus, Kindred—a regular in the Anchorage courthouse—could have reasonably assumed that Klugman had information that could doom Kindred's career. Then, right as Kindred was making a final effort to protect his judicial career by lying about his misconduct to the Judicial Council, Klugman was appearing before him. Klugman drafted nearly every pretrial motion. And Klugman won everything he argued, including a motion that successfully precluded the defense from presenting a key piece of evidence to support its theory of the case: evidence that Mr. Keays promptly and to his profound financial detriment repaid what he gained from ConocoPhillips while his co-defendant and the primary witness against him defaulted in a civil case seeking the same funds.

Therefore, there was not just the possibility of bias. Kindred's decisions suggest that there was bias.

Given the contemporaneous conflicts of interest, Klugman should never have appeared in this case. Or, at the very least, after the staffing decision was made, the defense should have been informed of the conflict to allow Mr. Keays to seek recusal. In light of new information revealing that Klugman's relationship with Vandergaw was common knowledge throughout the courthouse, along with Klugman's office's actual knowledge that Kindred was actively under investigation in part in connection with Kindred's relationship with Vandergaw, the government should have acknowledged the conflict and either staffed a different trial attorney or disclosed the conflict to the defense.

But the misconduct did not stop there. Klugman's misconduct became "flagran[t]" when he made misrepresentations in the course of this post-trial investigation. *Bundy*, 968 F.3d at 1031.

14

Klugman asserted that he had "no information that then Judge Kindred was aware before or during the *Keays* trial of [his] romantic involvement with AUSA Vandergaw." ECF No. 412-3 at 4. Vandergaw reiterated the same. ECF No. 412-4. Given how visible Klugman's affair with Vandergaw was, this statement is wholly unbelievable. Whether that was a reckless misrepresentation or an intentional lie does not matter in this analysis. Flagrant misconduct need not be "intentional or malicious." *Bundy*, 968 F.3d at 1038. "[R]eckless disregard for the prosecution's constitutional obligations" suffices to meet the standard of flagrant misconduct. *Id*. (quoting *United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008).

This is not the only lie Klugman told in connection with this post-trial investigation. Klugman also, for example, falsely claimed that he had no input in Vandergaw's promotion to Senior Litigation Counsel. *See* ECF No. 385 at 14. According to his managers, this statement is false. *Id.* ███████████████████████████████████████████ *See* ECF 415-1. It is clear that Klugman will say anything to serve his own interests and those of the woman with whom he is romantically involved.

Mr. Keays in this post-trial litigation is forced to rely on the word of three discredited individuals, two of whom are Assistant U.S. Attorneys ██████████████████████ ████████████████████ Those two individuals (Vandergaw and Klugman) have directly obstructed these proceedings by making misrepresentations. Dismissal is now the appropriate remedy to address the continuing deception perpetrated by Vandergaw and Klugman. *See Lopez*, 4 F.3d at 1463.

Yet, in responding to Mr. Keays' post-trial litigation, the government places Mr. Keays in a catch-22. In responding to Mr. Keays motion for a new trial, the government argues that Mr. Keays cannot meet his burden of proof in establishing that there was misconduct here. ECF No.

412 at 33, 35. For example, it uses against Mr. Keays in responding to his motion for a new trial the fact that the defense previously could not prove that Kindred knew about Klugman's relationship with Vandergaw. *Id.* at 35. It further argues that Mr. Keays cannot prove that Vandergaw attended trial because she only admits that she may have "popped in." *Id.* at 26, 33. The government, however, relies on statements by two government attorneys who have repeatedly shown a propensity to lie to protect their own reputations and careers. At least some of those statements are demonstrably false. The government cannot present the defense with at least one—perhaps more—false statements and then argue that the defense cannot meet its burden of proof.

   ii.   **Mr. Keays experienced substantial prejudice.**

Mr. Keays experienced substantial prejudice. First and foremost, he lost his trial after Kindred made decisions that exclusively favored the government even though Mr. Keays was never informed of the potential conflict nor provided the opportunity to move for recusal. Kindred effectively denied him the opportunity to present his defense when he denied him the opportunity to inform the jury of his efforts to repay ConocoPhillips. He then granted the government's mid-trial pivot to instruct the jury on deliberate ignorance. ECF No. 385 at 9.

Second, the case against Mr. Keays was not particularly strong, at least with respect to the essential element of his knowledge of the scheme. When a "case becomes progressively weaker, the possibility of prejudicial effect grows correspondingly." *United States v. Weatherspoon*, 410 F.3d 1142, 1151 (9th Cir. 2005) (remanding for a new trial). In *Weatherspoon*, the appellate court found prejudice in what it viewed as "a comparatively close case that boiled down to a battle over credibility" and found prosecutorial misconduct in improper vouching for a government witness by a prosecutor. *Id.* at 1152. Similarly, here, the entire case as to Mr. Keays' actual knowledge came down to the word of a cooperator whose credibility was eminently questionable. And Mr.

16

Keays was simultaneously prohibited from presenting evidence that went to his lack of knowledge (i.e. the lengths to which he went to promptly repay ConocoPhillips) by way of a motion by Klugman that Kindred granted.

Third, the levels of corruption and misconduct here are so pervasive that there is no way to undo what has been done. As discussed above and below, there has been misconduct by players at every level, from the initial investigation (by an FBI agent who was dismissed for misconduct), to the trial attorneys (one of whom is on administrative leave ███████████), to the judge (who resigned after findings of misconduct). Reconstructing the pieces of this five-year litigation that were legitimate while separating out the pieces that were illegitimate would be impossible.

Fourth, as a result of the misconduct by the judge and two prosecutors involved in this case, Mr. Keays lost access to his counsel of choice, who was a local defense attorney with access to the Anchorage legal community and four years of institutional knowledge in this case. Mr. Keays had sufficient funds only to pay his chosen counsel through one trial, not through significant post-trial litigation and a possible second trial. He now suffers from a significant disability because he was assigned out-of-district counsel whose familiarity with the local courthouse dynamics is limited to what is available via interviews. It is an uphill battle to establish wrongdoing when the very people whose testimony is necessary are the very people whose word cannot be trusted—two of whom are government attorneys. For example, undersigned counsel had no reason to know until receiving statements ██████████████████████ that the affair between Klugman and Vandergaw was obvious to all onlookers who worked in the Anchorage courthouse. Weeding through which statements are demonstrably false is a near-impossible task without the insight of an observer of those dynamics.

### iii.    A new trial is an insufficient remedy.

Granting Mr. Keays a new trial would be an insufficient remedy. First, the ongoing misrepresentations by Klugman—and the government's insistence that Mr. Keays and this Court rely on those statements despite the findings involving dishonesty against its own witnesses, *see* ECF No. 412 at 36-40—must be corrected. It is within this Court's supervisory powers to address this misconduct by dismissing the indictment. *See Lopez*, 4 F.3d at 1463.

Second, Mr. Keays experienced an investigation and a trial that was tainted at every juncture. He was investigated by an FBI agent who was dismissed for misconduct, the circumstances of which the government but not the defense is aware. He was prosecuted by a trial attorney ███████████████████████████████. And he lost a trial that was presided over by a judge who engaged in judicial misconduct and then lied about it, under oath, in the middle of Mr. Keays' trial.

There is, at this point, no way to discern between what in this case was a legitimate use of investigative, prosecutorial, and judicial power and what was the result of misconduct. A new trial cannot overcome the fact that Mr. Keays was investigated, prosecuted, and adjudged guilty by corrupt parties at every turn.

Third, a new trial is insufficient because this case relied so heavily on cooperator testimony that was thoroughly impeached at trial. There is no do-over that could remedy the injustice here when the prosecution now knows Mr. Keays' defense, his strategy on cross-examination, and the stark weaknesses in its own witness's testimony.

Mr. Keays' entire defense rested on his lack of awareness of the fraud. *See* ECF No. 385 at 8. Mr. Keays' co-defendant—Forrest Wright—was the government's sole witness as to what Mr. Keays actually knew about this scheme. *Id.* at 6. His direct and cross examinations lasted

multiple days, during which the defense highlighted Mr. Wright's lack of credibility, including his record of pathological lying, his record of lying to federal agents, his record of drug and alcohol abuse, and his own admission that he lied to Mr. Keays and his own family to defraud ConocoPhillips. *See* ECF No. 385 at 10; ECF No. 296 at 3-4.

Testimony by cooperators is inherently unreliable. "It is difficult to imagine a greater motivation to lie than the inducement of a reduced sentence." *United States v. Cervantes-Pacheco*, 826 F.2d 310, 315 (5th Cir. 1987). "Our judicial history is speckled with cases where informants falsely pointed the finger of guilt at suspects and defendants, creating the risk of sending innocent persons to prison." *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993). "Never has it been more true that a criminal charged with a serious crime understands that a fast and easy way out of trouble with the law is . . . to cut a deal at someone else's expense and to purchase leniency from the government by offering testimony in return for immunity, or in return for reduced incarceration." *Northern Mariana Islands v. Bowie*, 243 F.3d 1109, 1123 (9th Cir. 2001). "The use of informers, accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise serious questions of credibility." *On Lee v. United States*, 343 U.S. 747, 755 (1952).[10]

---

[10]    Various research illustrates the dangers of cooperator testimony. One study suggests a substantial number of wrongful convictions occur because of "perjury by prosecution witnesses"— over twice as many as erroneous eye-witness identification. Hugo Adam Bedau and Michael L. Radelet, *Miscarriages of Justice in Potentially Capital Cases*, 40 Stan. L. Rev. 21, 56 (1987) (table six). A second study concluded 20 percent of innocent defendants on death row were convicted based on false informant testimony. Barry Scheck, Peter Neufeld & Jim Dwyer, *Actual Innocence* 126-57 (Doubleday 2000). A third study found "several of the thirteen cases of men released from death row involved, at least in part, testimony from an in-custody informant." Illinois Governor's Commission on Capital Punishment at 122 (Apr. 15, 2002), http://illinoismurderindictments.law.northwestern.edu/docs/Illinois_Moratorium_

The risks of cooperator testimony arise in part because of the procedure cooperators use to prepare for their testimony. The government enjoys "the exclusive opportunity to prepare the witness, counseling and shaping her direct testimony and alerting her to the anticipated snares of cross-examination." George C. Harris, *Testimony for Sale: The Law and Ethics of Snitches and Experts*, 28 Pepp. L. Rev. 1, 52-53 (2000). Their testimony is likely to be developed through multiple interviews, and they "will often be provided multiple opportunities to change his or her story," possibly with the benefit of information from law enforcement. Jessica A. Roth, *Informant Witnesses and the Risk of Wrongful Convictions*, 53 Am. Crim. L. Rev. 737, 767 (2016).

The government should not be given the opportunity to try Mr. Keays' case again, now with the ability to correct its witness's testimony with insight into Mr. Keays' strategy for cross-examination. This does not remedy the substantial prejudice to Mr. Keays.

## B. In the alternative, prosecutorial misconduct also provides additional grounds for a new trial.

Although the remedy of a new trial is insufficient, it is a lesser remedy that the Court may pursue. *See, e.g.*, *United States v. Kojayan*, 8 F.3d 1315, 1325 (9th Cir. 1993) (ordering trial court to decide between retrying defendant and dismissing indictment as a sanction for prosecutorial misconduct); *United States v. Reyes*, 577 F. 3d 1069, 1079 (9th Cir. 2009) (remanding for new trial when the appellate court found that the prosecutor's engaged in misconduct that was not "so

---

Commission_complete-report.pdf. A fourth study found over 45 percent of wrongful capital convictions since the 1970s were based on false cooperator testimony. Rob Warden, *The Snitch System: How Snitch Testimony Sent Randy Steidl and Other Innocent Americans to Death Row*, Center on Wrongful Convictions, Northwestern University School of Law (2004), https://wwws.law.northwestern.edu/legalclinic/wrongfulconvictions/documents/snitchsystembooklet.pdf. A fifth study found the use of false incentivized testimony in 18 percent of capital cases with wrongful convictions. Brandon L. Garrett, *Judging Innocence*, 108 Colum. L. Rev. 55, 60 (2008).

egregious as to require dismissal."); *Weatherspoon*, 410 F.3d at 1152 (same). Ordering a new trial does not require a finding of either flagrant misconduct or substantial prejudice. Instead, it requires a showing that (1) there was ordinary misconduct and (2) that the misconduct "more probably than not materially affected the fairness of the trial." *United States v. Atcheson*, 94 F.3d 1237, 1244 (9th Cir. 1996).

Thus, a new trial is an alternative this Court may order that requires a lesser showing by Mr. Keays. Mr. Keays need only show that Klugman (or Vandergaw, or the U.S. Attorney's Office as a whole) engaged in misconduct that "more probably than not affected the fairness" of the trial. All of the misconduct and prejudice argued above, *see supra* Section III.A, would meet that standard. However, even the simple fact that the U.S. Attorney's Office—and Klugman specifically—had information about Kindred and Vandergaw that created the possibility of bias and did not disclose it to the defense meets both requirements. Mr. Keays' trial was fundamentally unfair, and, even if the Court finds dismissal is not warranted, a new trial certainly is.

## C. At the very least, an evidentiary hearing is necessary to probe the extent of the dishonesty in this investigation.

None of the individuals whose statements are relevant to Mr. Keays' request for relief have been subject to cross-examination. Even without cross-examination, however, Mr. Keays can identify statements by Klugman and Vandergaw that are false. And ███████████████████ ███████████████. Dismissal is warranted on these grounds alone.

At the very least, however, Mr. Keays should have the opportunity to cross examine the witnesses whose statements the government relies upon in opposing his motion for a new trial— and on whose statements the government surely will rely in opposing the instant motion. The false statements by Vandergaw and Klugman ████████████████████ them strongly suggest

that they have made other false statements in connection with this litigation. Mr. Keays should have the opportunity to probe the extent of their dishonesty.

**IV.     Conclusion**

Newly disclosed evidence makes clear that dismissal is the appropriate remedy in this case. Two Assistant U.S. Attorneys involved in this case, including one of two trial attorneys, █████████ ███████████████████████████████████████. Both have made statements in connection with this investigation that are demonstrably false.

At this point, dismissal is the only remedy to correct ongoing prosecutorial misconduct. In the alternative, prosecutorial misconduct provides an additional ground for a new trial that excludes the tainted judge and two tainted prosecutors. At the very least, an evidentiary hearing is warranted to allow Mr. Keays to examine the government's witnesses.

DATED July 22, 2025

                                        RENE L. VALLADARES
                                        Federal Public Defender


                               By:     *s/ Allie Wilson*
                                        Allie Wilson
                                        Assistant Federal Public Defender
                                        Counsel for Defendant Nathan Keays

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2025, a copy of the foregoing **Motion to Dismiss** was

served via the CM/ECF system on the following attorneys of record:

Steven Clymer: Steven.D.Clymer@usdoj.gov

Michael Heyman: Michael.Heyman@usdoj.gov

Adam Alexander: Adam.Alexander@usdoj.gov


<u>/s/Katrina Burden</u>
Employee of the Federal Public Defender