SCOTT BRADFORD
United States Attorney
District of Oregon

STEVEN D. CLYMER
Special Attorney
MICHAEL J. HEYMAN
United States Attorney
District of Alaska
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Telephone: (907) 271-1523
Email: steven.d.clymer@usdoj.gov
Email: michael.heyman@usdoj.gov

Attorneys for United States of America

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 3:20-CR-00085-GMS-MMS-2 |
| v. | Government's Response to Defense Motion to Dismiss |
| NATHAN MICHAEL KEAYS, Defendant. | **PUBLIC FILING** |

The United States of America, by and through its counsel of record, hereby responds

to and opposes defendant Nathan Michael Keays's motion to dismiss with prejudice based

on alleged prosecutorial misconduct. Dkt. #421.

# TABLE OF CONTENTS

Page No.

A.   Introduction. .......................................................................................... 4

B.   Factual and Procedural Background ...................................................... 5

C.   Governing Law ...................................................................................... 5

D.   Argument............................................................................................... 7

   1.  There is No Evidence of Prosecutorial Misconduct in Keays's
       Indictment or Trial ......................................................................... 7

       a.  Keays Does Not Allege Prosecutorial Misconduct in His
           Indictment................................................................................ 7

       b.  Assigning AUSA Klugman to the *Keays* Prosecution Was Not
           Prosecutorial Misconduct ........................................................ 7

       c.  Keays's Suggestions of *Giglio*, *Henthorn*, or *Brady* Violations
           are Meritless ......................................................................... 11

       d.  Keays Does Not Allege Any Other Prosecutorial Misconduct
           During Trial ........................................................................... 14

   2.  Recently Disclosed Information Upon Which Keays Relies
       Does Not Show Prosecutorial Misconduct or His Entitlement
       to Relief. ...................................................................................... 14

       a.  Defense Exhibit A ................................................................. 15

       b.  Defense Exhibit B ................................................................. 16

       c.  Keays's Claims Based on Defense Exhibit B Lack Merit ......... 18

   3.  Other Prosecutorial Misconduct that Keays Alleges Has No
       Relation to Keays's Prosecution .................................................. 21

4.  **Keays's Claim of Bias and in Support of Recusal is
    Speculative and Inconsistent with the Evidence** ........................... 23

5.  **Keays Has Not Provided a Valid Reason for an Evidentiary
    Hearing** ................................................................................................. 25

E.  **Conclusion** ........................................................................................................ 27

*U.S. v. Keays*
Case No. 20-CR-00085-GMS-MMS-2
Government's Response to Motion to Dismiss
Page 3

## A. Introduction

Keays demands draconian remedies. He maintains that this Court should both vacate a jury's verdict and foreclose re-prosecution, all without proof that *any* prosecutorial misconduct occurred in Keays's indictment or trial. This Court should deny Keays's motion to dismiss.

Keays received a fair trial co-prosecuted by a flawed lawyer. AUSA Andrew James Klugman was not, however, a witness with undisclosed impeachment information who testified at trial. Whether revelations about Klugman's personal life and credibility merit professional repercussions are matters for a different tribunal. Keays should not be rewarded with dismissal or a new trial when Klugman's out-of-court conduct had no bearing on Keays's indictment or conviction.

Among other things, Keays claims that recent disclosures by the government provide the foundation for both his motion to dismiss and his supplemental new trial motion. Dkt. #421 at p. 3-4, 11. In fact, as explained below, neither these disclosures nor anything else in the record support Keays's post-verdict claims for relief. Speculation about whether and when Kindred learned about the romance between AUSA Karen Vandergaw and Klugman, and whether Vandergaw and Klugman thought that Kindred had such knowledge does nothing to establish prosecutorial misconduct in Keays's prosecution or merit the relief Keays demands. This Court should deny both Keays's motion to dismiss,

Dkt. #421, and his supplemental new trial motion, Dkt. #382.[1]

## B.    Factual and Procedural Background

A description of Keays's offense conduct, the procedural history of this case, and the events on which Keays's claims for relief are based are set out in the government's response to Keays supplemental motion to dismiss, Dkt. #412 at pp. 6-26.

## C.    Governing Law

"The Court may dismiss an indictment with prejudice only in cases of flagrant prosecutorial misconduct." *United States v. Wenger*, No. 23-CR-00268-JSW-2, 2025 WL 28458, at *1 (N.D. Cal. Jan. 3, 2025) (internal quotation marks and citation omitted). Dismissal is a "disfavored" remedy. *United States v. Struckman*, 611 F.3d 560, 577 (9th Cir. 2010). "A district court may dismiss an indictment for government misconduct for one of two reasons, each with its own standard: either because it finds a serious due-process violation or because it concludes that dismissal is warranted under its supervisory powers." *United States v. Bundy*, 968 F.3d 1019, 1030 (9th Cir. 2020).

Courts set a high bar for dismissal. "Dismissal for a due-process violation requires the government's conduct to be 'so grossly shocking and outrageous as to violate the

---

[1] Keays's motion to dismiss was filed under seal at Dkt. #421. The government expects that Keays soon will file on the court's public docket a version with agreed-upon redactions. Keays's supplemental new trial motion was filed under seal at Dkt. #382; a redacted version was filed publicly at Dkt. #385. The government's response was filed publicly at Dkt. #412. Keays's reply was filed under seal at Dkt. #415; a redacted version was filed publicly at Dkt. #417. Citations here will be to the unredacted filings, whether sealed or not.

universal sense of justice.'" *Id.* (quoting *United States v. Kearns*, 5 F.3d 1251, 1253 (9th Cir. 1993)). Such clams typically arise "where law enforcement conduct involves extreme physical or mental brutality or where the crime is manufactured by the government from whole cloth." *United States v. Green*, 962 F.2d 938, 942 (9th Cir. 1992) (internal quotation marks and citation omitted).

"A district court may dismiss an indictment under its inherent supervisory powers (1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct." *Bundy*, 968 F.3d at 1030 (internal quotation marks and citations omitted). "To justify exercise of the court's supervisory powers, prosecutorial misconduct must (1) be flagrant and (2) cause 'substantial prejudice' to the defendant." *United States v. Ross*, 372 F.3d 1097, 1110 (9th Cir. 2004), *on reh'g in part*, 138 Fed. App'x 902 (9th Cir. 2005). "When considering an exercise of its supervisory powers, a district court has various options," only one of which is dismissal, the most drastic. *Bundy*, 968 F.3d at 1031; *see also United States v. Newland*, No. 17-CR-623 JLS, 2022 WL 2718614, at *6 (S.D. Cal. July 13, 2022) ("However, dismissal with prejudice is the most drastic remedy a Court can impose.") (internal quotation marks and citation omitted). A district court should exercise its supervisory power to do this only where "there is (1) flagrant misbehavior and (2) substantial prejudice and "where no lesser remedial action is available." *United States v. Hankins*, No. 23-610,

2024 WL 2180082, at *2 (9th Cir. May 15, 2024) (internal quotation marks and citation omitted).

## D. Argument

### 1. There is No Evidence of Prosecutorial Misconduct in Keays's Indictment or Trial.

#### a. Keays Does Not Allege Prosecutorial Misconduct in His Indictment.

Keays does not claim prosecutorial misconduct in connection with his indictment, which occurred on September 18, 2020. Dkt. #8. Nor could he. Klugman had not yet been assigned to the case. Vandergaw had worked as a filter AUSA during the investigation, *see* Dkt. #412 at p. 23 (describing Vandergaw's role as filter AUSA), but likely had at most a passing friendship with Kindred at that time, *id.* at p. 13. In any event, when the grand jury returned its indictment, the *Wright/Keays* case was assigned to a judge other than Kindred, *id.* at 23, and the case was not reassigned to Kindred until November 28, 2022, Dkt. #142. This was well after Vandergaw completed her filter review in February 2021. Dkt. #412 at p. 23.

#### b. Assigning AUSA Klugman to the *Keays* Prosecution Was Not Prosecutorial Misconduct.

Klugman entered his appearance on January 29, 2024, Dkt. #177, shortly before trial began on March 25, 2024, Dkt. #250. Keays does not expressly accuse the management of the United States Attorney's Office ["USAO"] of prosecutorial misconduct for permitting Klugman to co-try the *Keays* case. But Keays does criticize the government for

this staffing decision, or at least for not notifying defense counsel about the allegations concerning Vandergaw and Kindred, as well as what it then knew about Vandergaw's relationship with Klugman. Dkt. #421 at pp. 14 ("Given the contemporaneous conflicts of interest, Klugman should never have appeared in this case. Or, at the very least, after the staffing decision was made, the defense should have been informed of the conflict to allow Mr. Keays to seek recusal."); *id.* (arguing that "the government should have acknowledged the conflict and either staffed a different trial attorney or disclosed the conflict to the defense").

This criticism is unfounded, and, in any event, there was no prosecutorial misconduct in either the staffing decision or the lack of notice to defense counsel. When Klugman entered his appearance in *Keays*, the USAO was aware only of questionable hearsay allegations about the Vandergaw-Kindred relationship. Specifically, in early November 2022, a former Kindred law clerk who recently had become an AUSA reported to USAO management that during her clerkship, Kindred had told her that Vandergaw sent him naked pictures. Dkt. #412-1 at p .6, ¶ 8a.[2] At around the same time, another AUSA reported to USAO management that Kindred had told him that Vandergaw "shot her shot" with him multiple times, which the AUSA interpreted that to mean that she had made passes at the judge. *Id.* at p. 4, ¶ 4(f). In short, the reports the USAO management received

---

[2] This clerk-turned-AUSA further alleged that shortly after her clerkship ended, Kindred had initiated unwanted physical and sexual contact with her. *Id.* at pp. 6-7, ¶ 8.

from both these AUSAs were not based on their personal knowledge of a Kindred-Vandergaw relationship; instead, the AUSAs recounted statements that Kindred had made to them about Vandergaw. Significantly, Kindred's former law clerk also reported that Kindred was a "pathological liar." *Id.* at p. 6, ¶ 8b.

The USAO reported all this information both to the Chief Judge of the United States District Court for the District of Alaska, resulting in the Ninth Circuit's investigation, and to an appropriate DOJ component. *Id.* at p. 12, ¶ 12; *see also id.* at p. 10, ¶ 18. On about January 27, 2023, the USAO management learned that this DOJ component initiated an inquiry into the allegations concerning Vandergaw. *Id.* at p. 11, ¶ 19; Dkt. #412-6. On about April 20, 2023, the USAO learned that this inquiry had been closed "based in part on a written response from AUSA Vandergaw and a determination that further investigation was unlikely to result in a finding of professional misconduct." Dkt. #412-1, p. 11, ¶ 19; Dkt. #412-8.

Thus, when Klugman entered his appearance in *Keays* on January 29, 2024, the USAO had received only hearsay accounts of Kindred's statements concerning Vandergaw; had been told by a former law clerk that Kindred, the source of the information, was a "pathological liar"; and knew that a DOJ component had closed an inquiry into the matter after receiving written information from Vandergaw. The USAO received no information from Kindred about his relationship with Vandergaw. Further, at that time, the USAO had heard nothing about the status of the Ninth Circuit's investigation

of Kindred, and did not know whether or when the Ninth Circuit would take any action or issue any findings from its investigation. Dkt. #412-1, p. 9, ¶ 14. The USAO did not learn additional information about the Kindred-Vandergaw relationship until after the *Keays* trial, on July 8, 2024, when the Ninth Circuit Judicial Council's Order in *In Re Complaint of Judicial Misconduct*, Case No. 22-90121, was made public. *Id.* at pp. 9-10, ¶¶ 14, 15.

The USAO cannot be faulted for not relying on unproven and unreliable hearsay allegations about Kindred and Vandergaw when deciding whether to permit Klugman to co-try the *Keays* case. This is especially true when the presiding judge at the time, Kindred, was one of only two active District Judges in the District of Alaska, and staffing cases assigned to Kindred with certain AUSA was problematic because doing so would result in the cases being reassigned to a different judge because of the pending Ninth Circuit investigation. *Id.* at pp. 8-9, ¶ 12, 14.

Nor was the USAO remiss for not disclosing to defense counsel this unreliable hearsay. From the perspective of USAO management at that time, such notification could be unfairly detrimental to the careers and reputation of Vandergaw, Kindred, or both, or could have interfered with the Ninth Circuit's investigation. Even if assigning a different AUSA as government co-counsel to *Keays* (or any case assigned to Kindred) would have been more prudent, permitting Klugman to enter his appearance without making disclosure to opposing counsel hardly was prosecutorial misconduct meriting overturning a jury verdict and dismissing an indictment with prejudice. This is especially true where there is

no claim that Klugman committed misconduct during the *Keays* prosecution.

Nor did it matter that Vandergaw and Klugman were romantically involved and cohabitating when the USAO permitted Klugman to co-try *Keays*. Vandergaw did not represent the government in *Keays*, and instead only had served as a filter AUSA before the case was reassigned to Kindred (which also was before Klugman entered his appearance). Dkt. #412 at p. 23. Her limited follow-up after Kindred became presiding judge, which did not involve any contact with the district court, cannot have made staffing Klugman on the case as government co-counsel prosecutorial misconduct. Vandergaw merely ensured that Keays received production of potentially privileged documents and that these documents were not accessible to the government trial team. Dkt. #412 at pp. 23-26. And she performed these tasks only after Klugman had entered his appearance, meaning that USAO management did not know that she would play this (or any) further role when it permitted Klugman to enter the case. Dkt. #412-1 at p. 11, ¶ 21; *see also* Dkt. #412-2 at p. 5, ¶¶ 8, 9.[3]

---

[3] By the time Klugman entered his appearance, the USAO management had developed concerns about Klugman's candor. This made it advisable to use caution in assigning responsibility to Klugman, and indeed, he was demoted from his position as Criminal Chief in December 2023. But it was not prosecutorial misconduct to allow him to be co-counsel in the *Keays* case despite these concerns and this certainly does not merit overturning the jury's verdict and dismissing the charges.

### c. Keays's Suggestions of *Giglio*, *Henthorn*, or *Brady* Violations are Meritless.

Keays attempts to bolster his prosecutorial misconduct claim by reference to a former FBI agent's claims of government corruption posted on December 1, 2024, on a website called "The Alaska Landmine."[4]  The former agent, Tyler Vose, was assigned to *Keays* when he still was employed by the FBI.  In his posting, he described the FBI as "brainwash[ing] its people, especially the bootlickers who would stab their own mothers in the back to promote into positions of power over others."[5]  Vose alleged that while with the FBI, he "blew the whistle on serious allegations of misconduct and potential federal crimes and violations, over, and over, and over again" but was "systematically targeted by FBI Anchorage executive management" before being "forcefully discharged from the FBI."  Vose's many accusations include this: "Anchorage FBI management . . . filed what I believe to be a provably false document in camera to the then-U.S. District Court Judge Joshua Kindred in *US v. Nathan Keays*."

Based on this unadorned claim, and apparently without investigation, Keays suggests possible violations of *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and/or *United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991).

---

[4] The Alaska Landmine describes itself as focusing "on delivering non-partisan Alaska news that other media outlets don't always report, and we do so in a fun, entertaining and **high energy** way!"  *See* https://alaskalandmine.com/about/ (emphasis in original).

[5] *See* https://alaskalandmine.com/landmines/former-fbi-agent-details-retaliation-from-anchorage-office/.

Dkt. #421 at pp. 10-11.

But *Giglio* and *Henthorn* apply only to information that impeaches testifying witnesses (or declarants whose hearsay is admitted). *See, e.g.*, *Lewis v. Vang*, No. 2:02-CV-0013-TLN-JDP (DP), 2025 WL 1433851, at *26 (E.D. Cal. May 19, 2025); *United States v. Navarro-Cuevas*, No. CR-23-01448-001-PHX-JAT, 2024 WL 4503939, at *1 (D. Ariz. Oct. 16, 2024). Vose did not testify in Keays's trial and none of his out-of-court statements were offered for their truth. Dkt. #187 (post-trial witness list). Thus, neither *Giglio* nor *Henthorn* applied to him.[6]

Contrary to the above-quoted claim by Vose, the government is not aware of either any falsity in any document the government filed *ex parte* in the *Keays* case or any undisclosed "*Brady* information." Keays has had ample opportunity since the Vose diatribe appeared in the Alaska Landmine on December 1, 2024, to interview Vose or conduct further investigation to determine if there is any support for the bare-bones references in Keays's motion to dismiss to *Brady* and its progeny. Keays apparently has

---

[6] Nonetheless, in an abundance of caution, before the start of the *Keays* trial, an AUSA (other than Vandergaw, Klugman, or government co-counsel Michael Heyman) filed materials *ex parte* and, pursuant to a court order, then produced to defense counsel, subject to a protective order, a copy of a sealed and redacted document provided by Vose's employer in response to a *Henthorn* request. Accordingly, Keays's present claim that "[u]pon information and belief, the government informed Mr. Keays' trial counsel only of the basic detail that the former agent was dismissed but provided no details on the underlying misconduct," Dkt. #421 at p. 10, is incorrect. If Keays's present counsel did not receive this document from previous defense counsel (to whom the government produced it before trial), the government, upon request, again will provide a copy of the document. And, if this Court cannot easily access materials the government provided *ex parte* to the district court, the government, upon request, will provide such material to this Court *ex parte* and under seal.

done none of this. Accordingly, the Vose statement in the Alaska Landmine does nothing to establish prosecutorial misconduct.

### d. Keays Does Not Allege Any Other Prosecutorial Misconduct During Trial.

Although Keays criticizes Vandergaw and Klugman, he does not identify any misconduct by any AUSA during Keays's trial that could have affected the jury verdict. Nor does he offer legal authority for the proposition that a criminal defendant is entitled to have his conviction overturned and his indictment dismissed because a prosecutor engaged in misconduct unrelated to the defendant's trial conviction.

## 2. Recently Disclosed Information Upon Which Keays Relies Does Not Show Prosecutorial Misconduct or His Entitlement to Relief.

Keays asserts that his motion to dismiss "is prompted by two [recent] disclosures by the government," Dkt. #413 at p. 1, which he asserts provide "a sufficient basis to dismiss based on prosecutorial misconduct" and "also provide additional grounds for a new trial." *Id.* at p. 3. Although Keays trumpets these two documents—described as Defense Exhibit A, Dkt. #415-1, and Defense Exhibit B, Dkt. #415-2—as favorable to both his motion to dismiss and his supplemental new trial motion, they do not show that either dismissal or a new trial is warranted.[7]

Below, the government will describe these documents and explain why Keays

---

[7] To his credit, Keays does not contend that the government intentionally delayed producing these documents until after he filed his supplemental new trial motion. It did not. The document that

exaggerates the import of the information in them and asks this Court to draw speculative inferences from them. This discussion is applicable to arguments that appear in both Keays's motion to dismiss, Dkt. #421, and in Keays's reply, Dkt. #415, to the government's response, Dkt. #412, to Keays's supplemental motion for a new trial, Dkt. #382.

### a. Defense Exhibit A

The first document, Defense Exhibit A, Dkt. #415-1, is a letter from undersigned government counsel to Keays's counsel explaining that ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

Keays has labeled as "Defense Exhibit A" (Dkt. #415-1), produced to Keays on June 20, 2025, describes an event that occurred on June 6, 2025, which was after Keays had filed his motion. The document labelled "Defense Exhibit B" (Dkt. #415-2), produced to Keays on June 13, 2025, is an email message that undersigned government counsel, who was solely responsible for producing discovery in this matter, did not learn about or receive ████████████████ until after Keays had filed his supplemental new trial motion. And, although the email message was drafted and sent before Keays filed his motion, the AUSA who drafted and sent it was not involved in production of discovery in this case and was instructed ████████████████ that it related to a "confidential investigation" and that the AUSA "should not speak with anyone" about the message. Defense Exhibit B, Dkt. #415-2 at p. 7. Accordingly, the AUSA did not disclose to undersigned government counsel that the AUSA had drafted and sent the email message.

[redacted] The government produced all the relevant facts to Keays before he filed his supplemental new trial motion; the only new information is [redacted] [redacted] Thus, Defense Exhibit A adds nothing new to bolster Keays's motions to dismiss or for a new trial.

**b. Defense Exhibit B**

The second document, Defense Exhibit B, Dkt. #415-2, is an email message in which an AUSA describes the AUSA's perceptions of "interactions or communications between Klugman and Vandergaw [occurring in 2023] that would cause a reasonable person to question whether they were engaged in a romantic, intimate, or close personal relationship during the time that Klugman was [Criminal] Chief." *Id.* at p. 7. The government previously produced discovery consistent with the information in Defense Exhibit B, specifically circumstantial evidence showing that Vandergaw and Klugman had an undisclosed romance in 2023 while Klugman was Criminal Chief. Dkt. #412 at pp. 17-22 (describing already-produced evidence).

Keays focuses on information in Defense Exhibit B showing that the undisclosed romance was an "open secret" in the USAO and federal courthouse. Dkt. #421 at p. 4 (referring to "extensive talk throughout the federal courthouse both inside and outside the U.S. Attorney's Office"); *id.* at p. 7 ("Regardless of Klugman's and Vandergaw's claim that their romantic relationship began in January 2024, many throughout their office and the courthouse at large believed that the two were engaging in an affair many months earlier."). The government already produced evidence to this effect as well. *See, e.g.*, Dkt. #382-3 at p. 147 (testimony of First Assistant United States Attorney Kathryn Vogel learning that people in USAO believed that Vandergaw was in a relationship with Klugman and that they were spending time together); *id.* at 151 (Vogel receiving report of Vandergaw and Klugman sitting next to each other on couch in office); Dkt. #384-4 at p. 112 (United States Attorney S. Lane Tucker referring to "a lot of rumors about Karen and James being romantically involved"). In short, well before Keays filed his supplemental new trial motion, the government disclosed evidence showing that it was widely suspected that Vandergaw and Klugman were romantically involved in 2023, before either of them acknowledged this to USAO supervisors well. It is not "new" evidence.[8]

---

[8] By the time Keays's case went to trial in late March 2024, Vandergaw and Klugman were openly dating and cohabitating. Therefore, the relevance in Keays's case of Klugman's failure to disclose the relationship to his supervisors while he was Criminal Chief and their denials that they were romantically involved in 2023 is limited to credibility.

### c. Keays's Claims Based on Defense Exhibit B Lack Merit

Keays argues that the "open secret" evidence in Exhibit B proves that Klugman and Vandergaw made false sworn statements in declarations filed in support of the government's response to Keays's supplemental motion to dismiss, *see* Dkt. #412-3, Dkt. #412-4, and that these purported falsehoods establish prosecutorial misconduct requiring that his conviction be vacated, and his indictment dismissed with prejudice. Keays reasons as follows: if the romance was an open secret in the courthouse, then Kindred must have known about it, Dkt. #421 at pp. 4, 13[9]; and further, that Vandergaw and Klugman must have known that Kindred was aware of their romance, Dkt. #421 at pp. 3-4, 8.[10] Keays

---

[9] Keays overstates the likelihood that Kindred knew about the romance. Because others in the USAO and federal courthouse, including a magistrate judge who was a former AUSA, *see* Dkt. #415-2, strongly suspected, believed, or knew of a Vandergaw-Klugman romance in 2023 and openly discussed this among themselves may be relevant to show that Kindred also knew, but it hardly qualifies as conclusive proof. Kindred was not situated the same as others who worked in the federal courthouse. Although Federal District Judges share workspace in their chambers with law clerks and court staff, they largely work alone and have fewer opportunities for informal contact with others in the courthouse than federal employees whose jobs involve more collaboration and meetings. Further, unlike the magistrate judge described in Defense Exhibit B, Kindred had no pre-existing relationship with the USAO and, by 2023, was estranged from his former law clerk. Dkt. #382-2 at p. 59. By 2023, Kindred likely was a pariah. He was under investigation by the Ninth Circuit, a fact known to the Chief Judge who reported him to the Ninth Circuit, and cases assigned to him in which certain AUSAs had entered appearances had been reassigned to other judges, who likely knew the reason for the reassignments and undoubtedly were less than thrilled with the increased workload. It is doubtful that Kindred's peers were sharing gossip with him about USAO romances. Keays's passing speculation that Kindred would have known of the romance because of his relationship with Vandergaw, Dkt. #412 at p. 13, is implausible. It is doubtful that Vandergaw would have been eager to report a new romance to Kindred.

[10] Keays also overstates the likelihood of Vandergaw or Klugman being aware of Kindred's mental state regarding their romance. Vandergaw and Klugman may not have known what others,

---

argues that this proves the falsity of statements that Vandergaw and Klugman made in declarations.

Klugman's declaration states: "I know of no information suggesting that then Judge Kindred was aware before or during the *Keays* trial of my romantic involvement with AUSA Vandergaw." Dkt. #412-3 at ¶ 13. Vandergaw's declaration states: "I know of no information suggesting that Judge Kindred was aware before or during the *Keays* trial of my romantic involvement with AUSA Klugman." Dkt. #412-4 at ¶ 20. Keays maintains that "[b]oth statements are demonstrably false." Dkt. #421 at p. 9. Keays then concludes that these falsehoods, or at least Klugman's, qualify as prosecutorial misconduct requiring that his conviction be vacated, and his indictment be dismissed. *See* Dkt. #421 at p. 12 ("Klugman engaged in 'flagrant misbehavior' in connection with this litigation."); *id.* ("The level of misconduct amongst government attorneys involved in this case is astounding,"); *id.* ("Two government attorneys have provided statements in connection with this investigation and post-trial litigation that are demonstrably false but that serve to

---

including Kindred, suspected or knew about their relationship. When rumors spread about undisclosed romantic relationships, it not uncommon for the subjects of the rumors, here Vandergaw and Klugman, to remain ignorant of what others are saying about them behind their backs. This especially would be true for Klugman, who was in a position of authority as the Criminal Chief and thus not likely to be confronted by subordinates with suspicions about his suspected romance with a married colleague. And, even had one or both these AUSAS learned of such rumors, neither would have known whether Kindred was aware of information about their romance without having learned it, either directly from Kindred or indirectly from someone who had discussed the matter with Kindred. There is no evidence that this occurred.

both protect themselves from further professional ruin and to obstruct Mr. Keays from showing this Court the extent of the misconduct here.").

Keays argument lacks merit. Even if the "open secret" information in Defense Exhibit B establishes every fact that Keays claims—that Kindred knew of the romance; that Vandergaw and Klugman were aware of this; and that both made false statements to the contrary in their declarations[11]—Keays still would be wrong that this shows prosecutorial misconduct in this litigation meriting relief.

First, although both Vandergaw and Klugman were government employees when they signed their declarations, neither then represented the government in this case. Vandergaw never represented the government in *Keays*; Klugman withdrew his appearance on October 25, 2024, Dkt. #343, over three months before he signed his declaration on January 31, 2025. Dkt. #412-3 at p. 4. When they signed the declarations, the only status that Vandergaw and Klugman had in this litigation was as witnesses, not as representatives of the United States. Accordingly, even if the declarations contained false statements, this would not show that any prosecutor representing the government committed misconduct in this case.

Second, even had the alleged falsehoods in the declarations established prosecutorial misconduct in this post-verdict litigation, the declarations were not signed until long after Keays was convicted and thus had no bearing on Keays's indictment or

---

[11] The government does not concede any of these matters. *See, e.g.*, footnotes 9 and 10, *supra*.

trial. Keays does not explain how purported government falsehoods during litigation of a post-verdict motion merit overturning a conviction and dismissing an indictment without any proof of intentional and egregious government's misconduct in the indictment or trial.

### 3. Other Prosecutorial Misconduct that Keays Alleges Has No Relation to Keays's Prosecution.

Keays makes various other claims of alleged prosecutorial misconduct. None have any connection to Keays's case.

For example, Keays argues that "Vandergaw communicated with both Klugman and Kindred via an encrypted messaging application that allows for the deletion of messages from both sender and recipient" and "set her ordinary text application to delete messages." Dkt. #421 at p. 13; *see also id.* at p. 9. But there is no evidence that any of these text messages related to *Keays*. Keays claims that "[t]here is a reasonable assumption, therefore, that physical evidence that would support Mr. Keays' claim may have been destroyed." *Id.* at p. 13. This is not a "reasonable assumption"; it is pure speculation. Keays has not alleged, much less proven that Vandergaw or the messaging application she used caused the deletion of any messages related to *Keays*. And, in any event Keays does not allege or prove that Vandergaw acted in bad faith. *See, e.g.*, *United States v. Robertson*, 895 F.3d 1206, 1211 (9th Cir. 2018) ("The government's failure to preserve potentially

exculpatory evidence rises to the level of a due process violation only if the defendant shows that the government acted in bad faith.").

Keays also asserts that "[b]oth Vandergaw and Klugman have been found to have engaged in professional misconduct by their employer, in part based on findings of dishonesty, and are on administrative leave pending further review." Dkt. #421 at p. 13. As an example, Keays refers to Klugman having "falsely claimed that he had no input in Vandergaw's promotion to Senior Litigation Counsel." *Id.* at p. 15. But Keays does not allege, much less show, that any dishonest or otherwise improper conduct by Vandergaw or Klugman affected or related to his indictment or trial. Their dishonesty largely involved two relationships: Vandergaw's relationship with Kindred, and her relationship with Klugman, not matters related to the prosecution of Keays.

More generally, Keays claims that he "experienced an investigation and a trial that was tainted at every juncture," Dkt. #421 at p. 18, and then refers to the dismissal of the assigned FBI agent for misconduct; the dishonesty of one of the government trial attorneys; and the misconduct and dishonesty of the trial judge. *Id.* But Keays does not establish that any of this misconduct or dishonesty occurred during or otherwise involved his trial or prosecution. He essentially acknowledges this, bemoaning that "at this point, [there is] no way to discern . . . what in this case was a legitimate use of investigative, prosecutorial, and judicial power and what was the result of misconduct." *Id.* In fact, he has not established that *anything* in his prosecution "was the result of misconduct."

**4. Keays's Claim of Bias and in Support of Recusal Based on Kindred's Purported Fear of Klugman is Speculative and Inconsistent with the Evidence.**

Keays argues that he was prejudiced by Klugman's involvement in *Keays* because Kindred "could have reasonably assumed that Klugman had information that could doom Kindred's career," Dkt. #421 at p. 14, and thus apparently (although this is not stated in Keays's motion to dismiss), had reason to curry favor with Klugman. Keays advances this same contention in his reply to the government's response to Keays's supplemental new trial motion as requiring Kindred's recusal. Dkt. #415 at pp. 2, 9-10. Essentially Keays posits that Kindred knew or feared that Klugman, by virtue of his relationship with Vandergaw or his position as USAO Criminal Chief in 2023, knew the unfortunate details about Kindred's personal relationship with Vandergaw. Keays's theory that Kindred was biased for this reason— purportedly showing prejudice in support of the motion to dismiss—or would have appeared to be biased by a reasonable observer—and purportedly establishing that recusal was required—is both speculative and contrary to the evidence.

There is no evidence that Kindred knew or suspected that Klugman had learned from either Vandergaw or from the USAO management that Vandergaw had sent or was suspected of sending nude pictures of herself to Kindred or trading sexually suggestive text messages with him. Any inference that Kindred "feared" that Klugman knew these things is entirely speculative. *See, e.g.*, *United States v. Holland*, 519 F.3d 909, 914 n.5 (9th Cir. 2008) (explaining that speculation is insufficient to require recusal). Indeed, an objective

observer familiar with all the facts likely would conclude that Kindred believed the opposite, that his exchange of text messages with Vandergaw and receipt of nude pictures from her remained secret. Kindred reasonably could expect that Vandergaw had kept and would continue to keep quiet about sending nude pictures to a federal judge, especially with a Ninth Circuit investigation underway. Continuing to appear before Kindred without disclosure their personal relationship could subject Vandergaw to professional sanction, providing a powerful reason for her to keep quiet. Even if Kindred had learned that Vandergaw and Klugman were romantically involved, this would give Kindred greater assurance that Vandergaw had not shared her secret with Klugman. It would be unlikely for Vandergaw, indeed, for anyone, to reveal this kind of embarrassing personal information with a new partner at the outset of a romance.

In any event, even had Kindred believed or suspected that Klugman knew something about the nude pictures or other details of Kindred's relationship with Vandergaw, by the time Kindred made substantive decisions in *Keays*, Klugman was the least of Kindred's concerns. On March 1, 2024—before Kindred ruled on pretrial motions and before the *Keays* trial began—Kindred received a copy of the final report of the Ninth Circuit's Special Committee, which made clear that the Ninth Circuit's investigators knew about both Kindred's receipt of the Vandergaw nude pictures and Kindred's other misconduct with both Vandergaw and his law clerks. *See* Dkt. #412 at pp. 35-36 (discussing timing of Special Committee Report and *Keays* motions and trial). And unlike Klugman, the Ninth

Circuit had authority to adversely affect Kindred's reputation and career. If Kindred had reason to dread that his career could be doomed, it was not because of anything known or suspected by Klugman who, at best had second-hand hearsay information that was better known to the Ninth Circuit. Currying favor with Klugman or the USAO would have done Kindred no good. Thus, the evidence contradicts both the speculative "fear of Klugman" claim of bias in Keays's motion to dismiss, and the similarly speculative claim in Keays's reply in support of his supplemental new trial motion that recusal was required.

### 5. Keays Has Not Provided a Valid Reason for an Evidentiary Hearing.

Keays requests an evidentiary hearing to "cross examine the witnesses whose statements the government relies upon in opposing his motion for a new trial—and on whose statements the government surely will rely in opposing the instant motion," Dkt. #421 at p. 22, apparently meaning Vandergaw and Klugman. But if the sole reason for Keays's requested opportunity to cross-examine is to further discredit Vandergaw and Klugman, or, as Keays describes it, "to probe the extent of their dishonesty," *id.*, a hearing is not necessary. The government does not vouch for the credibility of witnesses. This includes Vandergaw and Klugman. It merely has informed the Court and defense counsel what witnesses with relevant information have said in response to questions. If this Court chooses to disbelieve part or all the information that Vandergaw, Klugman, or any other witness has provided in a statement, interview, or declaration, such disbelief will not satisfy Keays's burden of proving that there was sufficient prosecutorial misconduct in this case

requiring this Court to overturn his conviction and dismiss the indictment. *See, e.g.*, *Showell v. Comm'r*, 254 F.2d 461, 464 (9th Cir. 1958) (Pope, J., dissenting) ("It is elementary that a disbelief of a witness' testimony does not serve to supply evidence that is simply not to be found in the record."); *Seymour v. Oceanic Navigating Co.*, 453 F.2d 1185, 1191 (5th Cir. 1972) ("A trial judge may not use his disbelief of a witness as affirmative support for the proposition that the opposite of the witness's testimony is the truth."); *cf. Est. of Logan v. City of S. Bend, Indiana*, 50 F.4th 614, 615 (7th Cir. 2022) ("Disbelief of the only witness is not proof that the opposite of the witness's statements is true; disbelief would mean that the record is empty, and on an empty record the plaintiff loses, because the plaintiff has the burdens of production and persuasion.").

Accordingly, even if Keays can further discredit these or other witnesses at an evidentiary hearing, it will do nothing to satisfy his burden of affirmatively proving prosecutorial misconduct resulting in prejudice in his indictment or trial. Unless Keays can represent that he will be able to elicit affirmative evidence favorable to his motion at an evidentiary hearing, his request for such a hearing should be denied.

**E.      Conclusion**

For the reasons stated above, the government respectfully requests that the Court deny Keays's motion to vacate his conviction and dismiss the indictment with prejudice. The government reiterates its requests that the Court deny both Keays's supplemental and his initial new motion.  The Court can deny all Keays's motions without an evidentiary hearing.


RESPECTFULLY SUBMITTED July 29, 2025, at Anchorage, Alaska.

SCOTT BRADFORD
United States Attorney for the District of Oregon

Steven D. Clymer
Special Attorney
Acting Under Authority Conferred by 28 U.S.C. § 515
United States Department of Justice


**CERTIFICATE OF SERVICE**
I hereby certify that on July 29, 2025, a true and correct copy of the foregoing was served electronically on defense counsel.

United States Attorney's Office