# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| United States of America, | No. 3:20-cr-00085-GMS-MMS-2 |
| Plaintiff, | **ORDER** |
| v. | |
| Nathan Michael Keays, | |
| Defendant. | |

Before the Court are Defendant Nathan Michael Keays's Motion for a New Trial (Docs. 296, 382, 385[1]), Motion for Acquittal (Doc. 297), and Motion to Dismiss (Docs. 421, 423[2]). For the reasons provided below, Defendant's Motion for Acquittal and Motion to Dismiss are denied. Defendant's Motion for a New Trial is granted.

## BACKGROUND

On September 18, 2020, Defendant was indicted on charges of Conspiracy to Commit Wire Fraud under 18 U.S.C. § 1349 (Count I); Wire Fraud under 18 U.S.C. § 1343 (Counts II-XVII); Conspiracy to Commit Money Laundering under 18 U.S.C. §§ 1956(h), 1957(a) (Count XVIII); and Money Laundering under 18 U.S.C. §§ 1957(a), (2) (Counts XIX-XXIX). (Doc. 7-2; Doc. 8).

According to the indictment, throughout 2019, Forrest Nicholas Wright ("Wright") and Nathan Michael Keays ("Defendant") engaged in a scheme to defraud ConocoPhillips,

---

[1] Doc. 385 is the public version of Doc. 382, which is sealed. All citations in this Order will be to Doc. 385.
[2] Doc. 423 is the public version of Doc. 421, which is sealed. All citations in this Order will be to Doc. 423.

Wright's employer, of millions of dollars. (Doc. 8 at 2–3). In his position at ConocoPhillips, Wright "had the authority to approve orders for material and services for purchase and use" by the company. (*Id.* at 2). But he could only do so with "approved vendors." (*Id.*). Defendant—an Anchorage Police Department officer and high school friend of Wright—owned Eco Edge Armoring, LLC ("Eco Edge"). (*Id.* at 2–3).

Wright submitted fraudulent information about Eco Edge to ConocoPhillips to have Eco Edge designated an "approved vendor." (*Id.* at 4). To aid in the approval process, Wright and Defendant updated Eco Edge's website "to convey to [ConocoPhillips] and the public that [Eco Edge] was a legitimate oil and gas industry company," (*id.*) when, in fact, it was a residential foam insulation business. (Doc. 219 at 2–3). (*Id.*). Once Eco Edge was an "approved vendor," Wright and Defendant submitted fraudulent invoices to ConocoPhillips "for services that were not completed and for materials that did not exist." (Doc. 8 at 3–4). Through his personal email account, Wright drafted "industry specific content for [Defendant] to use in emails . . . sent to" ConocoPhillips about the non-existent material and labor. (*Id.* at 4). Wright sent Defendant—via Defendant's personal email account—the drafted emails, which Defendant then copied into business emails to ConocoPhillips. (*Id.*).

From within ConocoPhillips, Wright then used the emails "to justify contract awards to Eco Edge." (*Id.*). After contracts were awarded, Defendant "submitted approximately $3,251,383 in fraudulent invoices." (*Id.*). Wright subsequently instructed other ConocoPhillips "employees to approve the invoices." (*Id.*).

Once invoices were approved based on Wright's false representations, ConocoPhillips made electronic payments to Eco Edge's business bank account. (*Id.*). From there, Defendant "would send approximately [fifty] percent of the fraudulent proceeds" to the bank account of Spectrum Consulting Services ("Spectrum") which was controlled by Wright. (*Id.* at 3, 5). By October 2019, ConocoPhillips paid $3,087,720 to Eco Edge. (*Id.* at 5).

On September 26, 2020, Defendant pled "not guilty" to all Counts. (Doc. 18). For the next two years, Defendant's case proceeded before Judge Timothy Burgess, but on November 28, 2022, Defendant's case was reassigned to Judge Joshua Kindred. (Doc. 142).

Unbeknownst to Defendant at the time, in the weeks before Judge Kindred was assigned to Defendant's case, allegations of misconduct had begun to emerge against the Judge. *United States v. Spayd*, No. 3:19-cr-00111, 2025 WL 2825902, at *3–4 (D. Alaska Oct. 6, 2025). Though the full scale of his misconduct would remain unknown until the summer of 2024, Judge Kindred had already engaged in substantial sexual and professional misconduct by the time he became involved in this case. *In re Complaint of Judicial Misconduct*, No. 22-90121 (9th Cir. May 23, 2024).

## I.    Karen Vandergaw's Relationships with Judge Kindred and James Klugman

As early as the summer of 2020, Judge Kindred was engaging in an inappropriate relationship with Assistant United States Attorney ("AUSA") Karen Vandergaw ("Vandergaw"), meeting her in the federal building's gym, flirting with her, and discussing cases that the United States Attorney's Office for the District of Alaska ("USAO") had before him. *Spayd*, 2025 WL 2825902, at *2. Judge Kindred and Vandergaw eventually began exchanging nude photographs of each other and explicit messages about sex acts they wished to perform with one another. *Id.* Judge Kindred told at least one of his law clerks about his relationship with Vandergaw—including that Vandergaw sent him nude photographs. *Id.*

In October 2022, allegations of misconduct began to emerge against Judge Kindred. *Id.* at *3.

In the process of its investigation into Judge Kindred, USAO leadership learned of Judge Kindred's relationship with Vandergaw. (Doc. 412-1 at 6). Judge Kindred apparently told one of Vandergaw's fellow AUSAs, that she was "crazy" and claiming that he had recently "rejected several romantic overtures from [her] and had . . . refused to meet with her." *Spayd*, 2025 WL 2825902, at *4. ████████████████████

[REDACTED]

[REDACTED]

By November 2022, the USAO requested the District Court remove Vandergaw from Judge Kindred's cases. *Spayd*, 2025 WL 2825902, at *4.

In early 2023, USAO leadership was beginning to transition AUSA James Klugman ("Klugman") into a new role as its Criminal Chief. (Doc. 412-1 at 10). In this process, Klugman was told about the allegations surrounding Vandergaw's relationship with Judge Kindred, including the exchange of nude photographs [REDACTED] [REDACTED] (Doc. 412-1 at 10 [REDACTED]). Nonetheless—and despite his new role as her supervisor—Klugman and Vandergaw developed a romantic relationship that was widely speculated upon throughout the USAO. (Doc. 431 at 16–17).

By the end of 2022, Chief Judge Murguia of the Ninth Circuit identified a misconduct complaint against Judge Kindred, which focused on his misconduct with his clerks. *In re Complaint of Judicial Misconduct*, No. 22-90121 at 2–3. Following Judge Kindred's "unequivocal denial[]" of the allegations, Chief Judge Murguia appointed a Special Committee to investigate his conduct. *Id.* at 3.

In January 2023, Vandergaw, through USAO management, received a letter from a Department of Justice ("DOJ") component with "authority to conduct confidential investigations of allegations of serious misconduct by AUSAs," inquiring into her relationship with Judge Kindred. (Doc. 412 at 14 & n.12). When she answered the DOJ's letter on February 20, 2023, Vandergaw denied any "romantic, intimate, or close personal relationship with Judge Kindred," describing their relationship as "relatively distant and purely professional." *United States v. Hernandez-Zamora*, No. 3:21-cr-00062 (D. Alaska Dec. 10, 2024), ECF No. 406 at 4.

Throughout the course of 2023, Vandergaw begin communicating with Judge Kindred "less frequently," *id.* at 3, as her relationship with Klugman developed further. (Doc. 412-1 at 11–14). Klugman and Vandergaw began taking multi-day work-related

trips—attended only by the two of them—across the United States for optional trainings. (Doc. 412 at 18–21). Following these trips, multiple attorneys and staff members of the USAO complained to leadership about Klugman's favoritism towards Vandergaw and reported seeing inappropriate behavior between the two in Klugman's office. (Doc. 412-2 at 6; Doc. 431 at 16–17). When confronted by his supervisors with these complaints, Klugman repeatedly denied any romantic involvement with Vandergaw and continued to travel alone with her. (Doc. 412 at 19–20). When Klugman subsequently traveled for oral argument, Vandergaw took personal time off to go with him, shared a hotel room with him, and hid the trip from everyone else at the USAO. (*Id.* at 20). Klugman ended his engagement with his fiancée, Vandergaw ended her marriage, and the two moved in together. (*Id.* at 20–21).

Soon, knowledge of Vandergaw and Klugman's relationship spread beyond the USAO, such that other individuals working in the federal building—including a magistrate judge and United States Marshals—were openly discussing it. (Doc. 431 at 17, 18 n.9).

In his October 2023 interview, despite being confronted with evidence of his relationship with Vandergaw, Judge Kindred maintained that he "did not have a personal inappropriate relationship with [Vandergaw] and that they never exchanged any inappropriate communications, including inappropriate photographs." *In re Complaint of Judicial Misconduct*, No. 22-90121 at 25.

In December 2023, USAO leadership removed Klugman from the Criminal Chief position, concerned with his performance, his decisionmaking—including his insistence on a promotion for Vandergaw, and his apparent dishonesty—including his steadfast denial of his relationship with Vandergaw. (Doc. 412 at 20 n.16; Doc. 412-1 at 11–14; Doc. 412-2 at 5–7). Klugman continued to insist that his relationship with Vandergaw was platonic, until they took a trip to Hawaii together that they had planned months in advance. (Doc. 412 at 21 n.17; Doc. 412-1 at 2).

- 5 -

In late 2023 or early 2024, Vandergaw had a final conversation with Judge Kindred, in which they discussed their divorces, and he expressed interest in dating again. (Doc. 412 at 16).

## II. James Klugman's Involvement in Defendant's Prosecution

Klugman entered his appearance on behalf of the Government in this case on January 9, 2024. (Doc. 177). He took an active role in pre-trial litigation, authoring motions in limine and making important evidentiary arguments before Judge Kindred. (*See, e.g.*, Docs. 199–203).

In early March 2024, a few weeks before Defendant's trial, the Special Committee sent its investigative report to Judge Kindred and to the Ninth Circuit Judicial Council ("Judicial Council"). *In re Complaint of Judicial Misconduct*, No. 22-90121 at 9.

When Defendant's trial began on March 25, 2024, Klugman gave the Government's opening statement. (Doc. 250; Doc. 446 at 131–47). Over the first seven days of trial, the Government called several ConocoPhillips employees and contractors who provided evidence on the company's internal investigations of the alleged scheme (*see, e.g.*, Doc. 446 at 174–214; Doc. 448 at 80–87, 93–102, 173–77, 191–95); how Eco Edge became an "approved vendor" (Doc. 447 at 127–40); and how Eco Edge's contract, purchase orders, and receipts were approved and paid (*see e.g.*, *id.* at 144–49, 158, 197–98, 211–16; Doc. 448 at 40–41; Doc. 449 at 192–93). Many of these witnesses discussed Defendant's role in each stage of the scheme, including their reliance on Defendant's emails, phone calls, and invoices. (*See, e.g.*, Doc. 448 at 48–49, 53, 57). Other Government witnesses testified that Eco Edge's invoices were submitted through Defendant's account from two IP addresses associated with Defendant and Eco Edge (Doc. 449 at 142, 144, 161; Doc. 451 at 39–40; Doc. 420 at 27, 30); and that Defendant made significant changes to his website throughout the alleged scheme. (Doc. 449 at 161–68, 172–73).

Much of the trial was dominated, however, by the parties' examination of Wright. Klugman began his direct examination of Wright on the fourth day of trial (*id.* at 199), continuing throughout most of the fifth trial day, April 1, 2024 (Doc. 450). Defense

- 6 -

counsel's cross examination of Wright later that day (Doc. 266) and continued through the seventh day of trial, followed by Klugman's redirect. (Docs. 267, 268, 283). As Defendant describes it, the substance of Wright's testimony largely concerned how Wright devised the alleged scheme and how it was accomplished. (Doc. 296 at 3–4). Wright also testified, however, about his history of lying, anger towards Defendant, memory loss caused by his extensive substance abuse, and his plea deal with the government that required him to provide substantial assistance. (*Id.* at 3).

On April 4, 2024, Judge Kindred took a day off from trial (Doc. 385 at 8), to participate in the final stages of the Judicial Council's investigation of him. On April 5, 2024, Judge Kindred presented oral argument and testified before the Judicial Council. *In re Complaint of Judicial Misconduct*, No. 22-90121 at 3. Despite initially persisting in his attempt to evade accountability, Judge Kindred eventually admitted—"when specifically, and at times repeatedly, pressed with record evidence"—that "he had deliberately lied to the Special Committee." *Id.* at 2, 11–12. For the first time, upon again being "confronted again with . . . contemporaneous evidence" of his relationship with Vandergaw, Judge Kindred "performed an about-face" and admitted "that he received nude photographs . . . and that some flirtation occurred." *Id.* at 25. Judge Kindred further acknowledged that he had multiple opportunities to correct his deliberate lies and misstatements, including his October 2023 interview, his written response to the committee report, and during his oral argument at the beginning of his testimony. *Id.* at 13.

After his testimony with the Ninth Circuit Judicial Council, Judge Kindred returned to Defendant's trial on April 8, 2024. (Doc. 270). On the eighth and ninth days of trial, the Government's remaining witnesses further tied Defendant to the IP addresses from which the invoices for non-existent materials and labor were submitted (Doc. 420 at 26–30); and described the FBI's investigation of the alleged scheme, including digital evidence such as the false timesheets and evidence of Defendant's financial transactions (*see, e.g.*, *id.* at 49–56, 75–76, 129–34; Doc. 437 at 48, 53–54, 69–70, 74–91). The Government rested its case on April 9, 2024. (Doc. 437 at 195).

On April 10, 2024, the tenth day of trial, Defendant rested his case without presenting any evidence or witnesses of his own. (Doc. 438 at 28). Defense counsel subsequently made an oral motion for acquittal and to strike Wright's testimony. (*Id.* at 30–35, 38–39). Klugman argued against acquittal and Judge Kindred denied the motion. (*Id.* at 35–38, 40–43). After closing arguments, the jury began its deliberations and, the next day, found Defendant guilty on all counts. (*Id.* at 164; Doc. 292; Doc. 286).

On April 25, 2024, Defendant filed his initial Motion for New Trial (Doc. 296) and a renewed Motion for Acquittal (Doc. 297).

During the summer of 2024, the Judicial Council published its order regarding Judge Kindred's misconduct. *In re Complaint of Judicial Misconduct*, No. 22-90121. Following the order's publication, Judge Kindred resigned. *Spayd*, 2025 WL 2825902, at *1 n.1.

After Judge Kindred's resignation, the case was reassigned to Chief Judge Sharon Gleason (Doc. 305), and subsequently to Judge Ralph R. Beistline for sentencing (Doc. 310). Defendant's sentencing was ultimately vacated. (Doc. 314). Defendant filed a Motion to Stay the proceedings on his initial post-trial motions, pending investigation into the misconduct revealed in the Judicial Council's order. (Doc. 317). In early August 2024, the case was reassigned to this Court, which granted the stay on August 21, 2024. (Doc. 322). On October 25, 2024, Klugman withdrew from representing the Government in this case. (Doc. 343).

The Court lifted its stay on these proceedings on May 5, 2025. (Doc. 381). Defendant subsequently filed his Supplemental Motion for New Trial (Doc. 385) and a Motion to Dismiss (Doc. 423).

## DISCUSSION

Following a guilty verdict, Rule 25(b) allows a successor judge to either (1) "complete the court's duties" upon the "absence, death, sickness, or other disability" of the presiding judge; or (2) "grant a new trial" if (a) another judge cannot perform the presiding judge's post-trial duties or (b) "a new trial is necessary for some other reason." Fed. R. Crim. P. 25(b)(1)-(2). An "informed" successor judge who "is familiar with the case" has

broad discretion over how to proceed. *United States v. Spinney*, 795 F.2d 1410, 1413 (9th Cir. 1986); *United States v. Syjuco*, No. CR12-00037, 2014 WL 12708971, at *2 (C.D. Cal. July 7, 2014).

Upon reviewing the parties' briefs, the exhibits to those briefs, and the transcripts of trial, for the reasons discussed below, the Court denies Defendants' Motion for Acquittal and Motion to Dismiss. The Court grants Defendant's Motion for a New Trial.

## I. Motion for Acquittal

### A. Legal Standard

Under Federal Rule of Criminal Procedure 29, the sufficiency of the evidence underlying a conviction depends on whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Gagarin*, 950 F.3d 596, 602 (9th Cir. 2020) (quoting *United States v. Nevils*, 598 F.3d 1158, 1163-64 (9th Cir. 2010)). When making this determination, courts must draw "all reasonable inferences . . . in favor of the government, and [resolve] any conflicts in the evidence . . . in favor of the jury's verdict." *United States v. Alexander*, 48 F.3d 1477, 1490 (9th Cir. 1994) (quoting *United States v. Lucas*, 963 F.2d 243, 247 (9th Cir. 1992)). Further, courts should consider all evidence presented to the jury, even if it was improperly admitted. *United States v. Castaneda*, 16 F.3d 1504, 1510 (9th Cir. 1994) (citing *United States v. Bibbero*, 749 F.2d 581, 586 n.3 (9th Cir. 1984)).

When a conviction depends on witness credibility, the Court must be careful not to "invade[] the province of the jury to sort through the conflicting testimony and resolve conflicts in accordance with the 'reasonable doubt' standard." *United States v. Rojas*, 554 F.2d 938, 943 (9th Cir. 1977). As such, even uncorroborated testimony, called into question because of the witness's role as an accomplice, favorable plea agreements, or contradictions, "can support a conviction" unless the testimony is facially "incredible or unsubstantial." *United States v. Capati*, 980 F. Supp. 1114, 1122 (S.D. Cal. 1997) (quoting *United States v. Shelton*, 588 F.2d 1242, 1245 (9th Cir. 1978)) (quotation marks omitted). In other words, unless the "testimony was . . . inherently implausible," the jury should be

1  left to "fairly evaluate testimony and the effect of impeached credibility." *Rojas*, 554 F.2d
2  at 942–43.

3  **B.   Analysis**

4  Here, Defendant was convicted of Wire Fraud Conspiracy (Count I), Wire Fraud
5  (Counts II–XII), Money Laundering Conspiracy (Count XVIII), and Money Laundering
6  (Counts XIX–XXIX). (Doc. 292). Among other elements, each of the Counts brought
7  against Defendant required the Government to prove beyond a reasonable doubt that he
8  had some knowledge of the underlying fraudulent scheme. (Doc. 291 at 23, 25, 28–29).[3]
9  Defendant's Motion for Acquittal challenges the sufficiency of evidence underlying the
10 knowledge element of each Count. (Doc. 297 at 2).

11 Defendant makes two arguments in support of this challenge. (*Id.*). First, he argues
12 that while the Government's documentary evidence presented at trial "demonstrated
13 certain undisputed facts," that evidence "was merely circumstantial." (*Id.*). This argument
14 fails on its face. Merely pointing out the circumstantial nature of evidence does nothing to
15 challenge the sufficiency of that evidence: "[c]ircumstantial evidence and reasonable
16 inferences drawn from it may properly form the basis of a conviction." *Schad v. Ryan*, 671
17 F.3d 708, 717 (9th Cir. 2011), *overruled in part on other grounds by McKinney v. Ryan*,
18 813 F.3d 798, 818–19 (9th Cir. 2015).

19 Second, he argues that Wright's testimony was incredible and highly prejudicial,
20 pointing to: inconsistencies within Wright's testimony;[4] Wright's record of lying,

---

21 [3] On the Conspiracy Counts, the Court instructed the jury that the Government must prove
22 that Defendant "knew the objective of the agreement" to "engage in wire fraud" or "commit
   money laundering." (Doc. 291 at 23, 28). A defendant charged with conspiracy need "not
23 have full knowledge of all the details of the conspiracy" to be convicted. (*Id.* at 24). The
   Wire Fraud Counts required the Government to prove that Defendant "knowingly
24 participated in or devised" the fraudulent scheme. (*Id.* at 25). The Money Laundering
   Counts required the Government to prove beyond a reasonable doubt that Defendant
25 "knowingly engaged or attempted to engage in a monetary transaction" and "knew the
   transaction involved criminally derived property." (*Id.* at 29). The Government need not
26 prove Defendant's knowledge of "the precise nature of [the underlying] criminal offense"
   or of the fact that "the property involved in the transaction represented the proceeds of wire
27 fraud." (*Id.* at 29–30). The jury was further instructed that each knowledge element could
   be established if: (1) "the defendant [was] aware of the act and [did] not act through
28 ignorance, mistake, or accident" or (2) "the defendant was aware of a high probability" that
   the scheme was fraudulent and "deliberately avoided learning the truth." (*Id.* at 17).
   [4] For example, Wright "alternated between admitting that he set out to commit the fraud"

substance abuse, and memory impairment; Wright's bias, evident in the terms of his plea agreement and in his desire to get "veng[ance] against" Defendant; and the lack of testimony regarding how Wright and Defendant agreed to the scheme. (Doc. 297 at 2; Doc. 296 at 3–5). But these characteristics of Wright's testimony, without more, do not provide grounds for acquittal. The testimony of an accomplice—even uncorroborated testimony that contains inconsistencies—can support a conviction if a reasonable jury could find, based on facts and inferences drawn from that testimony, that a defendant was guilty beyond a reasonable doubt. *Capati*, 980 F. Supp. at 1122; *Rojas*, 554 F.2d at 942–43.

Here, though Defendant's argument about Wright's testimony does highlight genuine concerns about Wright's testimony as the Government's star witness, he does not show that it was "inherently implausible." *Rojas*, 554 F.2d at 943. In this case, Wright was on the stand for multiple days of trial, during which the jury had ample opportunity to assess his credibility, particularly under the rigorous questioning of defense counsel. Under these circumstances, even though Wright's testimony was that of an accomplice, riddled with "contradictions," potentially biased by "promises made . . . in return for . . . testimony," and riddled by "faulty memory," the Court finds no grounds to doubt the jury's ability to "fairly evaluate [the] testimony and the effect of [the] impeached credibility." *Id.* at 942–43.

Moreover, even discounting Wright's testimony, the Government's other evidence supports the jury's verdict because it would allow a reasonable fact finder to find that the Government established the knowledge elements of each Count against Defendant beyond a reasonable doubt. The Government provided evidence that, to help get Eco Edge approved as a vendor, Defendant changed the Eco Edge website to give the appearance that it was in the drilling industry (Doc. 447 at 131; Doc. 449 at 158, 161–68) and made false representations to ConocoPhillips personnel over email and over the phone (Doc. 447

_____

and that the scheme began with "intentions to perform." (Doc. 296 at 4). Wright also claimed that he thought Defendant was "morally upstanding" despite also claiming that Defendant was having an affair with Wright's wife. (*Id.*).

at 132–33, 137–38; Doc. 448 at 99; Doc. 449 at 122–23). He deleted emails that he and Wright exchanged during the scheme. (Doc. 437 at 69–70; Doc. 447 at 90–91). Further, false representations about materials and laborers were made through invoices (Doc. 447 at 211–16; Doc. 448 at 173–77, 222–23) which were submitted from IP addresses associated with Defendant and his business (Doc. 448 at 53, 57; Doc. 449 at 142–44, 161; Doc. 451 at 39–40; Doc. 420 at 27, 30). Defendant further misled ConocoPhillips employees through statements and documents that he provided over email and over the phone (Doc. 447 at 149, 211–16; Doc. 448 at 184, 187, 190–91, 216–18; Doc. 449 at 58–59, 114). And ConocoPhillips's payments went into the Eco Edge Bank Account before Defendant divided them approximately in half between himself and Wright. (Doc. 437 at 191; Doc. 448 at 42).

From this evidence, a rational trier of fact could find that the Government proved, beyond a reasonable doubt, that Defendant had the requisite knowledge for each Count against him. As such, the Court will not invade the province of the jury to overturn its credibility determination and assessment of the evidence.

Accordingly, Defendant's Motion for Acquittal is denied.

## II. Motion to Dismiss Indictment

### A. Legal Standard

A district court can grant a motion to dismiss an indictment for government misconduct if it finds either (1) that the misconduct amounts to a serious due process violation or (2) that the misconduct warrants dismissal under the court's supervisory powers. *United States v. Bundy*, 968 F.3d 1019, 1023 (9th Cir. 2020) (citing *United States v. Kearns*, 5 F.3d 1251, 1253 (9th Cir. 1993)). Dismissals based on due process violations are meant to "preserv[e] fairness for the individual defendant and remedy[] any harm that has been done to his basic rights." *United States v. McClintock*, 748 F.2d 1278, 1284 (9th Cir. 1984) (quoting *United States v. Sears, Roebuck & Co., Inc.*, 719 F.2d 1386, 1394 (9th Cir. 1983) (Norris, J., dissenting)). Dismissals based on the Court's supervisory powers are instead "premised on the inherent ability of the federal courts to 'formulate procedural

- 12 -

rules not specifically required by the Constitution or the Congress.'" *Id.* (quoting *United States v. Hasting*, 461 U.S. 499, 505 (1983)). In either case, dismissal of an indictment will only be granted when no lesser remedy is adequate.

Here, Defendant seeks dismissal of his indictment only under the Court's supervisory powers and only in response to alleged prosecutorial misconduct. (Doc. 423 at 11–20).

District courts' supervisory power allows them to "dismiss an indictment . . . even if 'the conduct does not rise to the level of a due process violation.'" *Bundy*, 968 F.3d at 1030 (quoting *United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991)). "Federal courts have an independent interest in ensuring that criminal trials are conducted [fairly and] within the ethical standards of the profession." *Wheat v. United States*, 486 U.S. 153, 161 (1988). The courts therefore hold the power "to supervise the administration of criminal justice among the parties before the bar." *McClintock*, 748 F.2d at 1284 (quoting *United States v. Payner*, 447 U.S. 727, 735 n.7 (1980)). Though courts can use this power to achieve many ends, *United States v. W.R. Grace*, 526 F.3d 499, 511 n.9 (9th Cir. 2008), it is generally used "(1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct.'" *Bundy*, 968 F.3d at 1030 (quoting *United States v. Struckman*, 611 F.3d 560, 574 (9th Cir. 2010)).

But before a court can dismiss an indictment with prejudice under its supervisory powers, it must find: "(1) flagrant [prosecutorial] misbehavior and (2) substantial prejudice,'" and (3) that "no lesser remedial action is available." *Bundy*, 968 F.3d at 1031 (first quoting *Kearns*, 5 F.3d at 1253; and then *United States v. Chapman*, 524 F.3d 1073, 1087 (9th Cir. 2008)). "This is a high standard, limit[ed] . . . to extreme cases." *United States v. Doe*, 125 F.3d 1249, 1257 (9th Cir. 1997).

First, the defendant must allege flagrant prosecutorial misconduct. *Bundy*, 968 F.3d at 1031 (quoting *Kearns*, 5 F.3d at 1253). Courts generally treat individual instances of

misconduct as flagrant when a prosecutor recklessly or intentionally fails to comply with their "ethical and constitutional obligation[s] . . . as a representative of the government to protect the integrity of the court and the criminal justice system." *Cf. Commonwealth of N. Mariana Islands v. Bowie*, 243 F.3d 1109, 1122 (9th Cir. 2001) (describing the special role of the prosecutor in ensuring due process); *see, e.g., Bundy*, 968 F.3d at 1038–42 (finding flagrant misconduct in a prosecutor's "conscious choice" to withhold substantial, material evidence). But even when an isolated instance of prosecutorial misconduct cannot be considered flagrant, "[i]n some cases a pattern of misconduct by a particular prosecutor or his office" may warrant use of the supervisory power. *McClintock*, 748 F.2d at 1284–85. In rare circumstances, the supervisory power may be used to address flagrant prosecutorial misconduct that occurred before—rather than during—the trial, so that Government does not benefit from its misconduct just because it occurred outside of the courtroom. *United States v. Ross*, 372 F.3d 1097, 1099–110 (quoting *United States v. Williams*, 504 U.S. 36, 46 (1992)); *United States v. Simpson*, 927 F.2d 1088, 1091 (9th Cir. 1991) ("The supervisory power comprehends authority for the courts to supervise their own affairs . . . ; rarely, if ever, will judicial integrity be threatened by conduct outside the courtroom that does not violate a federal statute, the Constitution or a procedural rule.").

Second, "[t]he defendant must demonstrate prejudice before the court may exercise its supervisory powers to dismiss an indictment." *Struckman*, 611 F.3d at 574–75; *see also United States v. Lopez*, 4 F.3d 1455, 1464 (9th Cir. 1993). In this context, "the proper prejudice inquiry is whether the government conduct 'had at least some impact on the verdict and thus redounded to [the defendant's] prejudice.'" *Ross*, 372 F.3d at 1110 (quoting *Lopez*, 4 F.3d at 1464). In other words, substantial prejudice requires that the flagrant prosecutorial misconduct directly impacted the parties' arguments and had clear ramifications on the verdict. *See, e.g., Bundy*, 968 F.3d at 1038–42 (finding substantial prejudice when the government withheld substantial, material evidence that would have "directly negated" its theory of the case).

Finally, a defendant must convince the court "that no lesser remedy will fully

- 14 -

address the damage caused by the government's misconduct." *Id.* at 1043. In determining whether a lesser remedial action—such as new trial—is appropriate, courts will "consider the government's willfulness in committing the misconduct and its willingness to own up to it." *United States v. Kojayan*, 8 F.3d 1315, 1318 (9th Cir. 1993). For example, the need to deter future misconduct may be particularly strong in cases where the prosecutor is unwilling to take accountability for outrageous actions. *Bundy*, 968 F.3d at 1044–45. A new trial may also be unavailable in cases where such a remedy "would advantage the government," for instance, by "allowing it to salvage . . . a poorly conducted prosecution." *Chapman*, 524 F.3d at 1087. In any case, the "drastic remedy" of dismissal of an indictment with prejudice can only be granted if a "lesser sanction [would] put the defense at a greater disadvantage than it would have faced" absent the misconduct. *Bundy*, 968 F.3d at 1043.

## B. Analysis

Though there was widespread government misconduct occurring on the periphery of Defendant's case, Defendant fails to establish flagrant prosecutorial misconduct that would justify the Court's exercise of its supervisory power to dismiss the indictment against him with prejudice. For the reasons discussed below, Defendant's Motion to Dismiss is denied.

Defendant's argument fails at the first step because he does not identify any flagrant prosecutorial misconduct within the Court's supervisory power. Defendant's allegations describe Judge Kindred's conduct (i.e., ruling in the Government's favor); conduct that occurred beyond the scope of the Court's supervisory power[5] (i.e., Klugman's relationship with Vandergaw; Klugman's lies to his supervisors about that relationship; etc.); or conduct that occurred after Defendant's conviction (i.e., Klugman's repeated misrepresentations,

---

[5] As noted above, it is rare that the supervisory power will apply to conduct that occurred outside the courtroom. *Simpson*, 927 F.2d at 1091. Though the power may apply when judicial integrity is threatened, *id.*, Defendant's Motion to Dismiss is based on prosecutorial misconduct and he fails to identify how *prosecutorial*—rather than *judicial*—misconduct threatened judicial integrity in this case. Defendant's broad aspersions regarding the "levels of corruption and misconduct here" (Doc. 423 at 17) cannot be addressed by granting a motion to dismiss with prejudice based on prosecutorial misconduct.

made under oath, during the post-trial investigation). (Doc. 423 at 12–16). While many of Defendant's allegations do reflect misconduct[6] which casts doubt on the propriety of prosecutorial conduct throughout this case, Defendant cannot rely on doubt to demonstrate *flagrant* prosecutorial misconduct. Indeed, doubt cannot satisfy the "high standard" that must be met to warrant the Court's use of its supervisory powers, which can only be used in "extreme cases." *Doe*, 125 F.3d at 1257.

Because Defendant fails to meet the first requirement of the Court's exercise of its supervisory power, the Court will not address substantial prejudice or remedial action. Defendant's Motion to Dismiss is denied.

## III.    Motion for New Trial

Because Defendant's Supplemental Motion for New Trial (Doc. 385) provides adequate grounds for the Court to grant his motion, the Court will not address the bases for a new trial that he asserts in his original motion (Doc. 296).

### A.    Legal Standard

Under Federal Rule of Criminal Procedure 33, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. "A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal." *United States v. Alston*, 974 F.2d 1206, 1211 (9th Cir. 1992). Relief under Rule 33, however, is limited by Rule 52, which prevents courts from granting a new trial where the underlying error was harmless. Fed. R. Crim. P. 52(a). Indeed, a new trial should only be granted "in exceptional circumstances." *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1153

---

[6] Some of Defendant's allegations do not identify misconduct. For instance, Defendant expresses concern with the involvement of a former law enforcement agent who was involved in the investigation of Defendant and Wright. (Doc. 423 at 9–11). The agent was removed from other investigations and fired from his agency. (*Id.* at 10). Defendant now claims that that defense counsel was never made aware of the potential disclosure issues involving the agent. (*Id.* at 11). But Defendant's prior counsel had a hearing before Judge Kindred on the potential disclosure issues and filed a sealed notice of their position on the Government's ability to call the agent to testify or use the fruits of agent's investigation. (Doc. 195). Defendant makes no argument as to how any resulting use of evidence produced by the agent's investigation prejudiced Defendant at trial or affected his conviction.

(citing *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981)). Such circumstances include "a serious miscarriage of justice." *Alston*, 974 F.2d at 1211-12 (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)).

A successor court may also grant a defendant's motion for a new trial "if satisfied that . . . a new trial is necessary." Fed. R. Crim. P. 25(b)(2)(B). Under 25(b)(2)(B), a court may find that a new trial is a "manifest necessity." Fed. R. Crim. P. 25 cmt. (Advisory Committee 2002).[7] "[A] determination of manifest necessity is an exercise of discretion." *United States v. Bonas*, 344 F.3d 945, 948 n.3 (9th Cir. 2003). The Ninth Circuit has upheld successor courts' use of this discretion in the context of Rule 25(a) to allow mistrials in "extraordinary circumstances" of judicial misconduct and recusal, when other results "would not remove the appearance of partiality concerning all prior rulings and all actions of the indicted judicial officer." *See, e.g.*, *United States v. Isaacs*, 359 Fed. App'x 875, 876–77 (9th Cir. 2009) (citing *United States v. Jaramillo*, 745 F.2d 1245, 1248–49 (9th Cir. 1984)).

Judicial recusal may be required constitutionally, statutorily, or according to professional codes of conduct. *Williams v. Pennsylvania*, 579 U.S. 1, 13 (2016). Constitutional due process issues "demark[] only the outer boundaries of judicial disqualifications." *Id.* (quoting *Aetna Life Ins. Co v. Lavoie*, 475 U.S. 813, 828 (1986)). But statutes and professional codes of conduct "provide more protection than due process requires." *Id.* (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 890 (2009)).

Federal statute 28 U.S.C. § 455(a) provides such protection: requiring the recusal of any judge "in any proceeding in which his impartiality might reasonably be questioned."[8]

---

[7] The Government argues that a new trial may only be granted under Rule 25(b)(2)(B) when the requirements for a new trial under Rule 33 are met. (Doc. 412 at 26). But this reading of Rule 25 would render subsection (b)(2)(B) superfluous. Rule 33 provides a post-conviction procedure, generally handled by the presiding judge, and is therefore already encompassed by Rule 25(b)(1), which allows a successor court to "complete the court's [post-trial] duties." A successor judge may therefore grant a defendant's motion for a new trial (1) under Rule 33, as authorized by Rule 25(b)(1); (2) under Rule 25(b)(2)(A), after determining that only the presiding judge could have performed the post-trial duties; or (3) under Rule 25(b)(2)(B), after determining that a new trial is otherwise necessary.

[8] The Code of Conduct for United States Judges uses similar language: "a judge must disqualify himself or herself in a proceeding where his or her impartiality could reasonably

The inquiry does not depend on "the reality of bias or prejudice but its appearance." *United States v. Carey*, 929 F.3d 1092, 1104 (9th Cir. 2019) (quoting *Liteky v. United States*, 510 U.S. 540, 548 (1994)). The appearance of impartiality is a "fact-driven" inquiry which "may turn on the subtleties in the particular case." *United States v. Holland*, 519 F.3d 909, 913 (9th Cir. 2008). Under this objective standard, whether a judge's impartiality may be reasonably questioned is not based on the perception of "someone who is 'hypersensitive or unduly suspicious,' but rather is a 'well-informed, thoughtful observer.'" *Id.* (quoting *In re Mason*, 916 F.2d 384, 385 (7th Cir. 1990)).

The well-informed observer is assumed to have "knowledge of all the facts." *Carey*, 929 F.3d at 1104 (quoting *Yagman v. Republic Ins.*, 987 F.2d 622, 626 (9th Cir. 1993)). This assumption applies even if a judge did not have actual knowledge of "a disqualifying circumstance." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 859 (1988) (quoting 28 U.S.C. § 455(a)). Indeed, regardless of the judge's actual knowledge of disqualifying circumstances, § 455 will require recusal "so long as the public might reasonably believe that [the judge] knew" of those circumstances. *Id.* at 860 (citing the legislative history of 28 U.S.C. § 455(a)); *United States v. Richey*, 924 F.2d 857, 869 n.9 (9th Cir. 1991).

When considering the public's assessment of the judiciary under § 455's objective standard, judges "must bear in mind that" the well-informed observer is "less inclined to credit judges' impartiality and mental discipline than the judiciary itself will be." *Holland*, 519 F.3d at 914 (quoting *In re Nettles*, 394 F.3d 1001, 1002 (7th Cir. 2005)). But "[t]he standard 'must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice.'" *Id.* at 913 (quoting *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993)).

Though § 455 does so more readily, due process similarly requires recusal if, "as an objective matter, the average judge" in the same circumstances is "[un]likely to be neutral," creating an "unconstitutional potential for bias." *Williams*, 579 U.S. at 8 (quoting

be questioned." *United States v. Sierra Pac. Indus., Inc.*, 862 F.3d 1157, 1173–74 (9th Cir. 2017).

*Caperton*, 556 U.S. at 881) (quotation marks omitted). Though judicial recusal based on due process was once limited to cases in which the judge had an actual "direct, personal, substantial, pecuniary interest," the Supreme Court has also recognized recusal will be required when "the probability of actual bias on the part of the judge . . . is too high to be constitutionally tolerable." *Caperton*, 556 U.S. at 876–77 (first quoting *Tumey v. Ohio*, 273 U.S. 510, 523 (1927); and then *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)); *In re Murchison*, 349 U.S. 133, 136 (1955) ("[O]ur system of law has always endeavored to prevent even the probability of unfairness."). Thus, like § 455, the "due process standard does not require 'any showing of actual bias.'" *Chen ex rel. Chen v. Albany Unified Sch. Dist.*, 56 F.4th 708, 725–26 (9th Cir. 2022) (quoting *Stivers v. Pierce*, 71 F.3d 732 (9th Cir. 1995)).

This standard is meant to protect "public legitimacy of judicial pronouncements and . . . the rule of law itself." *Williams*, 579 U.S. at 16. As such, "[w]hen the objective risk of actual bias on the part of a judge rises to an unconstitutional level, the failure to recuse cannot be deemed harmless." *Id.* Indeed, the right to an impartial judge is a right "so basic to a fair trial that [its] infraction can never be treated as harmless error.'" *Hasting*, 461 U.S. at 508 n.6 (citing *Chapman v. California*, 386 U.S. 18, 23 (1967) (citing *Tumey*, 273 U.S. 510)). When such basic rights are violated by a judge's failure to recuse, "there is structural error that requires automatic reversal." *Greenway v. Schriro*, 653 F.3d 790, 805 (9th Cir. 2011).

As discussed above, Rule 33 and Rule 25(b)(2)(B) of the Federal Rules of Criminal Procedure allow the Court to grant a new trial when "justice so requires" or upon a finding of "manifest necessity." Fed. R. Crim. P. 25(b)(2)(B), 25 cmt., 33. A constitutionally intolerable risk of bias, as described above, provides such grounds. *Cf. Jaramillo*, 745 F.2d at 1249 (finding that a successor judge's continuation of proceedings "would not remove the appearance of partiality concerning all prior rulings and all actions" of the presiding judge, such that the successor "would necessarily be compelled to begin the trial anew"). And though § 455 "does not, on its own, authorize the reopening of closed litigation,"

*Liljeberg*, 486 U.S. at 863, its analysis does inform whether such grounds for a new trial exist. *See Spayd*, 2025 WL 2825902, at *10–11, 10 n.9. Under § 455, determining "whether a judgment should be vacated" because a judge's impartiality may be reasonably questioned is based on consideration of "[1] the risk of injustice to the parties in the particular case, [2] the risk that the denial of relief will produce injustice in other cases, and [3] the risk of undermining the public's confidence in the judicial process." *Liljeberg*, 486 U.S. at 861, 864. Vacating a judgment under this standard is meant "to rectify an oversight and to take the steps necessary to maintain public confidence in the impartiality of the judiciary." *Id.* at 861.

### B. Analysis

Here, the issue of whether Defendant should be granted a new trial is reducible to two questions:

(1) Would the circumstances underlying (a) Klugman's romantic relationship with Vandergaw, (b) Vandergaw's undisclosed relationship with Judge Kindred, and (c) the investigation of the Judicial Council that ran contemporaneous to Defendant's trial, lead a well-informed, thoughtful observer to reasonably question Judge Kindred's impartiality in this case such that he would be required to recuse?[9]

(2) If Judge Kindred was required to recuse, did his failure to do so create a risk of injustice that, statutorily or constitutionally, makes it necessary to grant Defendant's Motion for a New Trial under Rule 25(b)(2)(B) or Rule 33?

For the reasons discussed below, the Court answers both questions in the affirmative and grants Defendant's Motion for a New Trial.

### 1. Recusal

Under the objective standards governing both the § 455 and due process inquiries, the circumstances of Defendant's trial required Judge Kindred's recusal. A well-informed, thoughtful observer with knowledge of all the facts in this case could reasonably question

---

[9] Defendant also argues that either (a) Vandergaw's behind-the-scenes involvement in some stages of Defendant's prosecution or (b) Judge Kindred's misconduct and resignation alone would have required his recusal. (Doc. 385 at 22–24). Because the Court grants Defendant's motion on other grounds, it need not address either of these arguments but notes that Judge Kindred's misconduct standing alone would not warrant a new trial because it does not raise the issue of partiality with any particularity. *See, e.g., Holland*, 519 F.3d at 913 (noting that § 455 analysis is particular to the claim at issue).

- 20 -

Judge Kindred's impartiality and perceive a probability of actual bias, given that Klugman likely had private information that, if revealed, could seriously compromise Judge Kindred.

The Government's opposition to Defendant's Motion for a New Trial relies heavily on arguments about Judge Kindred and Klugman's actual knowledge of each other's relationships with Vandergaw. (Doc. 412 at 31–37; Doc. 432 at 4–5). Though Defendant bears the burden of showing that a reasonable person would question Kindred's partiality, he does not bear the burden of proving what Judge Kindred knew about Klugman and Vandergaw's relationship. Nor does he bear the burden of proving what Klugman knew about Judge Kindred and Vandergaw's relationship. The objective standards governing both statutory and constitutional recusal depend upon the *appearance* or *risk* of impartiality, not *actual* impartiality. *Carey*, 929 F.3d at 1104; *Chen*, 56 F.4th at 725–26.

Here, Defendant has carried his burden, showing that a well-informed observer and the public could reasonably believe that Judge Kindred had knowledge of the circumstances which necessitated his recusal. Klugman and Vandergaw engaged in a not-so-secret affair, which was widely speculated upon throughout the federal building, where Judge Kindred, Klugman, and Vandergaw all worked. Others in the building, including USAO attorneys and staff, a magistrate judge, and the Marshals, had noticed and openly discussed Klugman and Vandergaw's relationship. And unlike these other outside observers, Judge Kindred had a demonstrated interest in Vandergaw's personal life, including talking to her about dating around the time that Klugman entered his appearance in Defendant's case. As such, the public could reasonably believe that Judge Kindred was aware of Klugman and Vandergaw's relationship. Second, Judge Kindred knew that Vandergaw had substantial knowledge of his misconduct, including the details of their relationship, which were, at that time, still unknown to investigators. Third, Vandergaw and Klugman were living together at the time of trial in this matter. Because of the intimate nature of Vandergaw and Klugman's relationship, a reasonable observer could believe that Judge Kindred also knew that Klugman had knowledge of the Judge's relationship with Vandergaw. The mere fact that Klugman had some knowledge—potentially including all

the details known to Vandergaw, but at least the information disclosed to him by the USAO—is relevant to whether Judge Kindred would have been able to remain impartial and neutral. Third, when Defendant's trial began, Judge Kindred had actual knowledge of the Special Committee's investigation and his impending Judicial Council testimony.

The Government argues that Judge Kindred would not "attempt to curry favor with Vandergaw, any other AUSA, or the USAO generally by ruling in the [G]overnment's favor in [Defendant's] case" because he had already received the Special Committee's report against him and must have known that his career was doomed by the time that Defendant's trial began. (Doc. 412 at 35–36). Nevertheless, Judge Kindred did not resign until July 8, 2024, months after the initial trial in this matter was complete. At the time of this trial Judge Kindred still had much to hide.

While the Special Committee Report issued on March 1, 2024 principally focused on Judge Kindred's inappropriate relationships with his clerks, it also mentioned that he told one of those clerks that an AUSA had sent nude pictures of herself to him. *In re Complaint of Judicial Misconduct*, No. 22-90121 at 5. Although the Committee apparently asked Judge Kindred about this matter, Judge Kindred lied to the Committee, claiming "that he neither engaged in a flirtation with a separate, more senior AUSA, nor received nude photographs from her." *Id*. at 24.

As Defendant notes, Judge "Kindred was in the final throes of lying to protect his judicial career." (Doc. 417 at 9). Since the beginning of the investigations against him, Judge Kindred falsely and unequivocally denied any inappropriate personal relationship with Vandergaw, which in any event was not the initial focus of the investigation into Judge Kindred. Vandergaw had done the same, including lying to the DOJ. When Defendant's trial began, at the end of March, Judge Kindred was preparing to testify before the Judicial Council, but he had not corrected his lies to the Committee. He interrupted this trial, which was almost complete, to appear in front of the Judicial Council on April 5. At that hearing, Judge Kindred continued to lie to the Judicial Council at least in his initial presentation, seemingly under a belief that he could still salvage his career. Nevertheless, under

- 22 -

questioning from the Council, he admitted to the flirtation, receiving nude photos from Vandergaw, and other damning facts. *In re Complaint of Judicial Misconduct*, No. 22-90121 at 24.

In any event, Judge Kindred had still not yet apparently faced the inevitability of the loss of his judicial career. He did not announce his resignation until approximately three months later. And, even when Judge Kindred admitted to a relationship with Vandergaw to the Judicial Council, his admission was incomplete. He only told the Judicial Council that he flirted with Vandergaw and *received* nude photographs from her—omitting that, at least according to Vandergaw, he himself sent suggestive texts and photos to Vandergaw. Of course, Judge Kindred had already presided over seven days of Defendant's eleven-day trial before taking time off to testify before the Judicial Council and any irreparable damage that resulted from his impartiality during trial would have been done.

Further, even upon the Judge's return to trial, Vandergaw and Klugman still knew of additional misconduct beyond what Judge Kindred had admitted to before the Judicial Council. Judge Kindred would presumably have feared the ramifications of that additional evidence: ███████████████████████████████████████ and had attempted to discredit her, characterizing her as a crazy, spurned woman.

Though the circumstances of Judge Kindred's association with Vandergaw and Klugman are unique, *see Hernandez-Zamora*, ECF No. 406 at 9–10, they are circumstances under which Judge Kindred's impartiality and ability to remain neutral could be reasonably questioned. Regardless of the actual knowledge of either Klugman or Judge Kindred, the nature of the relationships between each of these men and Vandergaw, when combined with the Judicial Council's investigation of Judge Kindred, provides more than an "unsubstantiated suggestion of personal bias or prejudice." *Holland*, 519 F.3d at 913. Given the confluence of facts here, a well-informed observer could reasonably believe that Judge Kindred would be tempted to maintain Klugman's favor throughout Defendant's trial under the belief that Klugman had evidence of the Judge's misconduct that Judge Kindred feared would come to light.

In sum, the circumstances of this case suggest too many instances in which Judge Kindred was "offer[ed] a possible temptation . . . to forget the burden of proof required to convict the [D]efendant, or . . . to [fail to] hold the balance nice, clear, and true between the state and the accused." *Tumey*, 273 U.S. at 532. Klugman played a substantial role in pre-trial litigation, argued evidentiary objections throughout trial, was responsible for the multi-day examination of the Government's star witness, argued that evidence which Defendant believed was key to the defense should be excluded, and responded to defense counsel's oral motion for acquittal. Each instance of Judge Kindred's "possible temptation" in this case "denie[d] the [Defendant] due process of law," *id.*, by creating an unconstitutionally high probability of bias. The same conduct created an appearance of impartiality. As such, § 455 and due process required Judge Kindred's recusal in this case.

### 2. Failure to Recuse

The unconstitutionally high risk of judicial bias that Defendant faced violates the due process clause and § 455, constituting an error which cannot be considered harmless, and which entitles Defendant to relief from judgment, in the form of a new trial under either Rule 33 or Rule 25(b)(2)(B).

Constitutionally, although the Government argues that Judge Kindred's failure to recuse was harmless error (Doc. 412 at 40–47), a violation of the right to a fair trial—presided over by an impartial judge—cannot be harmless error. *Williams*, 579 U.S. at 16; *Hasting*, 461 U.S. at 508 n.6 (citing *Chapman*, 386 U.S. at 23 (citing *Tumey*, 273 U.S. 510)). The risk of Judge Kindred's bias in this case constitutes "structural error," rendering the proceedings against Defendant fundamentally unfair and requiring "automatic reversal." *Greenway*, 653 F.3d at 805.

Statutorily, the three *Liljeberg* factors under § 455 also support Defendant's Motion for New Trial. First, as already discussed above, the risk of injustice to the Defendant is high. Denial of trial before an impartial judge is a fundamental violation of Defendant's rights, regardless of the Government's insistence that it was harmless. (Doc. 412 at 45). Because of Judge Kindred's failure to recuse, Defendant did face injustice during his trial,

and if the Court were to deny his motion, he would face further injustice at the hands of the judiciary.

Second, "granting a new trial in this case will not produce injustice in other cases." *Hernandez-Zamora*, ECF No. 406 at 11. Unlike other recent cases from this District, such as *Silverton Mountain Guide LLC v. United States Forrest Service*, No. 3:22-cv-00048, 2025 WL 715842, at *2, 5 (D. Alaska Feb. 21, 2025) in which a civil defendant sought relief from judgment based on the theory that Judge Kindred's conflicts with some of the attorneys inside the USAO should be imputed to *all* of its attorneys, there is no risk that granting a new trial here will open the floodgates for litigation challenging the Judge's prior cases. The complicated web of relationships, knowledge, investigations, and the Judge's testimony before the Judicial Council that took place in the middle of Defendant's trial will not "create a basis to relitigate all of Judge Kindred's closed cases." *Spayd*, 2025 WL 2825902, at *11.

Finally, the third *Liljeberg* factor bears emphasis here: denying Defendant a new trial under these circumstances would pose a substantial risk of undermining the public's confidence in judicial process. Granting Defendant's motion for a new trial is necessary here "to rectify" Judge Kindred's failure to recuse "and to take the steps necessary to maintain public confidence in the impartiality of the judiciary." *Liljeberg*, 486 U.S. at 861.

In sum, the tangled circumstances of Defendant's conviction posed a risk of partiality that violated both statutory and constitutional standards, and, as such, cannot "satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 14 (1954). Under Rule 33, the Court finds that Judge Kindred's failure to recuse himself from Defendant's case resulted in "a serious miscarriage of justice," *Alston*, 974 F.2d at 1211-12 (quoting *Lincoln*, 630 F.2d at 1319), which cannot be considered harmless. *Williams*, 579 U.S. at 16. As such, the "interest of justice" require a new trial. Fed. R. Crim. P. 33. Similarly, under Rule 25(b)(2)(B), the Court finds a "manifest necessity" for a new trial, given that "the appearance of partiality concerning all prior rulings and all actions of" Judge Kindred cannot otherwise be removed from Defendant's case. Fed. R. Crim. P. 25(b)(2)(B), 25

cmt.; *Isaacs*, 359 Fed. App'x at 876–77 (citing *Jaramillo*, 745 F.2d at 1248–49).

Accordingly, Defendant's Motion for New Trial is granted.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant's Motion for Judgment of Acquittal (Doc. 297) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Dismiss (Docs. 421, 423) is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant's Motion for New Trial (Docs. 296, 382, 385) is **GRANTED.**

**IT IS FURTHER ORDERED** setting a video Status Conference for **February 11, 2026, at 1:00 p.m. (AKST) (3:00 p.m. Arizona time)** in Courtroom 3, James M. Fitzgerald United States Courthouse, 222 W 7th Avenue, Anchorage, AK 99513 to schedule a trial date and set any pre-trial deadlines.

Dated this 30th day of January, 2026.

G. Murray Snow
Chief United States District Judge